872 So.2d 250 (2004)
STATE of Florida, Appellant/Cross-Appellee,
v.
Henry Alexander DAVIS, Appellee/Cross-Appellant.
Henry Alexander Davis, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC02-803, SC03-186.
Supreme Court of Florida.
February 19, 2004.
Rehearing Denied April 21, 2004.
*251 Charles J. Crist, Jr., Attorney General and Scott A. Brown, Assistant Attorney General, Tampa, FL, for Appellant/Cross-Appellee, Petitioner.
Leslie Anne Scalley, Assistant CCRC and Marie-Louise Samuels Parmer, Assistant CCRC, Capital Collateral Regional Counsel-Middle Region, Tampa, FL, for Appellee/Cross-Appellant, Respondents.
PER CURIAM.
This case comes to us as a State appeal of a trial court order granting a new penalty phase on Davis's motion for postconviction relief, a cross-appeal by Davis of the denial by the trial court of a new guilt phase, and a petition by Davis for a writ of habeas corpus.[1] The trial court ordered a new penalty phase after concluding that Davis's trial counsel was ineffective in failing to adequately investigate and present evidence of Davis's brain damage and background, and in failing to assert the statutory "age" mitigator. We do not reach this issue, and instead conclude that a new guilt phase is warranted because the blatant expressions of racial prejudice by trial counsel in this case constitute ineffective assistance of counsel that affected the fairness and reliability of the proceedings to such an extent that our confidence in the outcome is undermined.

I. FACTS AND PROCEDURAL HISTORY
The facts pertinent to the issue we decide today are as follows. Davis, an African-American male who was 22 at the time, was accused of stabbing to death Joyce Ezell, a 73-year-old white woman, in the foyer of Ezell's house in Lake Wales on March 18, 1987. Davis was arrested two days after the murder. Two other attorneys preceded trial counsel in representing Davis on these charges. In preparing his defense, Davis's first lawyer visited the home of Davis's family, where a relative asked him about Davis's seizures, a condition of which the attorney had been unaware. This discovery led that attorney to gather additional information and then successfully move to have Davis declared incompetent to stand trial in September 1988. The first attorney withdrew, and a second attorney represented Davis from September 1988 to June 1989, until he also withdrew. Davis was declared competent, and a third attorney, who is the subject of the ineffective assistance claim herein, then assumed representation of Davis. The third attorney, whom we refer to herein as trial counsel, represented Davis in his January 1990 murder trial.
Trial counsel testified in the postconviction proceedings that in presenting his defense in this case, he favored a "minimalist," "less is more" approach. Accordingly, trial counsel declined to present the testimony of two African-American witnesses whose testimony might have implicated *252 others in the murder, consistent with Davis's defense that he was present during or just after a murder that was committed by someone else. Trial counsel also elected not to call friends and family members who would have contradicted testimony by an acquaintance of Davis that on the day after the murder, Davis had bloody scratches around his eyes. Additionally, as found by the trial court in its order granting Davis a new penalty phase, trial counsel "did not obtain Davis's school records, never visited Davis's family or neighborhood, [and] did not talk to his family members, coaches or friends."
These considerations serve as a backdrop for trial counsel's comments while questioning an apparently all-white panel of potential jurors during voir dire.[2] Using what he described during the rule 3.850 hearing as a hand-drawn chart with a thermometer to discuss how the jurors' "feelings might grow in intensity possibly towards black people," trial counsel stated:
Now, Henry Davis is my client and he's a black man, and he's charged with killing Joyce Ezell who was a white lady, lived in Lake Wales. Now, all of us that are talking now, myself and all of y'all, are all white.

There is something about myself that I'd like to tell you, and then I'd like to ask you a question. Sometimes I just don't like black people. Sometimes black people make me mad just because they're black. And, you know, I don't like that about myself. It makes me feel ashamed. But, you know, sometimes if this was a thermometer of my feelings, and if you took it all the way up to the top, and this was one, this was five, all the way up here was ten, you know, my feelings would sometimes start to boil and I get so mad towards black people because they're black that it might go all the way up to the top of that scale. And, you know, I'm not proud of that and it embarrasses me to tell y'all that, to say it in public.
(Emphasis supplied.) In followup questioning of individual jurorsnone of whom stated that they shared counsel's sentimentstrial counsel stated, "Well, I'm a white southerner, and I've got those feelings in me that Imaybe I grew up with them." During his penalty-phase closing argument, trial counsel reminded the jurors of his comments during jury selection:
Henry is a black man, Mrs. Ezell was a white woman. We are all of us white. I'm a white southerner. You have told me and the court that you would disregard and not base your verdict on the question of race. I will believe you, I will trust you on that. It is hard for me to talk to you, my friends and neighbors, about something like this. I will not believe that race will be a factor in your decision, but I will ask you to be especially vigilant, because being a white southerner, I know where I come from. And I told you a little bit when we were questioning you as to potential jurors about some feelings that I have, and maybe very deep down y'all have them too.
During the rule 3.850 hearing, trial counsel testified that he decided on the comments excerpted above as a way of getting jurors to "drop the mask" and acknowledge hidden feelings about race. He testified that his comments constituted *253 "new ground" for him, but he felt the approach was warranted because this was an "extreme case, a very bad case on the facts." Trial counsel testified that he discussed the strategy with Davis, who told him that blacks sometimes feel the same way about whites.
The jury found Davis guilty as charged of first-degree murder, robbery with a deadly weapon, and burglary with a battery, and recommended death for the murder by a vote of twelve to zero. The trial court imposed the death penalty for the murder, finding four aggravating circumstances and insufficient mitigation to justify a sentence other than death. On direct appeal, this Court struck two aggravators and remanded for resentencing. See Davis v. State, 604 So.2d 794, 797-99 (Fla. 1992). The trial court again imposed death on remand, and this Court affirmed. See Davis v. State, 648 So.2d 107, 110 (Fla.1995).
In his motion for postconviction relief, Davis asserted multiple grounds for a new trial, including trial counsel's comments during voir dire, the failure to call witnesses whose testimony would have tended to implicate others in the murder, and the failure to impeach a witness who testified to scratches on Davis's face. The trial court denied relief on all these grounds. The trial court determined that the remarks on racial animus made by counsel during voir dire were a legitimate tactical approach by experienced counsel, and that Davis approved the tactic. The court concluded that "[n]othing in the record supports Davis' claim that his attorney is a racist and as a result failed to properly represent him."

II. ANALYSIS
Claims of ineffective assistance of trial counsel require a showing of deficient performance and prejudice. See generally Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, a defendant must establish conduct on the part of counsel that is outside the broad range of competent performance under prevailing professional standards. See Gore v. State, 846 So.2d 461, 467 (Fla. 2003). Second, the deficiency must be shown to have so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined. See id. The two prongs are related, in that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Rutherford v. State, 727 So.2d 216, 219 (Fla.1998) (quoting Strickland, 466 U.S. at 686, 104 S.Ct. 2052). In reviewing a trial court's ruling on an ineffective assistance claim, this Court defers to findings of fact based on competent, substantial evidence and independently reviews deficiency and prejudice as mixed questions of law and fact. See Gore, 846 So.2d at 468; Stephens v. State, 748 So.2d 1028, 1033-34 (Fla.1999).
Applying these standards and principles, we conclude that the expressions of racial animus voiced by trial counsel during voir dire so seriously affected the fairness and reliability of the proceedings that our confidence in the jury's verdicts of guilt is undermined. We cannot agree with the trial court's conclusion that an explicit expression of racial prejudice can be considered a legitimate tactical approach. Whether or not counsel is in fact a racist, his expressions of prejudice against African-Americans cannot be tolerated.
Initially, we strongly reaffirm the principle that racial prejudice has no acceptable place in our justice system. As we stated *254 in Powell v. Allstate Insurance Co., 652 So.2d 354, 358 (Fla.1995),
[t]he founding principle upon which this nation was established is that all persons were initially created equal and are entitled to have their individual human dignity respected. This guarantee of equal treatment has been carried forward in explicit provisions of our federal and state constitutions. It is not by chance that the words "Equal Justice Under Law" have been placed for all to see above the entrance to this nation's highest court. If we are to expect our citizens to treat one another with equal dignity and respect, the justice system must serve as the great example of maintaining that standard. And while we have been far from perfect in implementing this founding principle, our initial declaration and our imperfect struggle and efforts have served as a beacon for people around the world.
In Powell, we considered whether to authorize an inquiry to ascertain whether racist jokes and statements were made by jurors in a trial involving a suit by the plaintiffs, who were black citizens of Jamaica, against an insurance company for claims arising from an automobile accident. See id. at 355. We authorized the inquiry, and ruled that if the trial court determined that the statements were in fact made, the comments warranted a new trial. See id. at 358. Rejecting any notion that this was not a proper concern within the purview of the justice system, we stated:
The issue of racial, ethnic, and religious bias in the courts is not simply a matter of "political correctness" to be brushed aside by a thick-skinned judiciary....
Despite longstanding and continual efforts, both by legislative enactments and by judicial decisions to purge our society of the scourge of racial and religious prejudice, both racism and anti-Semitism remain ugly malignancies sapping the strength of our body politic. The judiciary, as an institution given a constitutional mandate to ensure equality and fairness in the affairs of our country when called on to act in litigated cases, must remain ever vigilant in its responsibility. The obvious difficulty with prejudice in a judicial context is that it prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require. A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestations to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires.
Id. (quoting United States v. Heller, 785 F.2d 1524, 1527 (11th Cir.1986)). The United States Supreme Court has observed that it has been compelled to "engage[ ] in `unceasing efforts' to eradicate racial prejudice from our criminal justice system." McCleskey v. Kemp, 481 U.S. 279, 309, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (quoting Batson v. Kentucky, 476 U.S. 79, 85, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)).
The necessity of vigilance against the influence of racial prejudice is particularly acute when the justice system serves as the mechanism by which a litigant is required to forfeit his or her very life. As the United States Supreme Court first stated more than twenty-five years ago, "death is different in kind from any other punishment imposed under our system of criminal justice." Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); see also State v. Dixon, 283 So.2d 1, 7 (Fla.1973) (stating that because *255 "[d]eath is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation ..., the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes"). We have acknowledged that "death is different" in recognizing the need for effective counsel in capital proceedings "from the perspective of both the sovereign state and the defending citizen." Sheppard & White, P.A. v. City of Jacksonville, 827 So.2d 925, 932 (Fla.2002).
In Robinson v. State, 520 So.2d 1, 7 (Fla.1988), this Court emphasized that the "risk of racial prejudice infecting a criminal trial takes on greater significance in the context of a capital sentencing proceeding." Accordingly, we vacated a death sentence because of the prosecutor's suggestion during cross-examination of a defense expert that the black defendant preyed on white women.
In a noncapital case, the First District overturned a second-degree murder conviction because of an improper appeal to racial prejudice. See Wallace v. State, 768 So.2d 1247, 1250-51 (Fla. 1st DCA 2000). In Wallace, the prosecutor disregarded the trial court's admonition against emphasizing that before a fatal confrontation with another man, the black defendant was making vulgar remarks to a white woman. See id. at 1249. The First District stated:
In the present case, the jurors were required to determine whether the homicide was justifiable. The race of the woman with whom the defendant had been conversing in the café earlier in the evening had nothing to do with the issue of his guilt or innocence. All the prosecutor needed to do to put the events in the proper context was to elicit a brief statement that the defendant was asked to leave because he was arguing with another patron. Nevertheless, he repeatedly emphasized that the woman in the café was a white woman and he repeatedly stressed the fact that the defendant had been making vulgar comments to her.

These actions effectively invited the jury to make a decision based on a characterization of the defendant and not on the evidence of his guilt or innocence. Without even a pretense of relevancy the prosecutor managed to conjure up the image of a black man making rude and sexually offensive comments to a white woman. Some members of the defendant's all-white jury may have reacted negatively to this portrayal of the defendant, regardless of their views of the evidence.

We are not suggesting that the jurors were affected by the prosecutor's appeal to racial prejudice merely because all of them are white. The point is that no jury should be exposed to an argument like the one made in this case.

Id. at 1250 (emphasis supplied).
In light of the repeated admonitions by the United States Supreme Court, this Court, and others against allowing racial prejudice to play any part in the determination of guilt or imposition of sentence in a criminal case, we are greatly disturbed by trial counsel's blatant acknowledgment to the jury, in defending an African-American defendant accused of an interracial crime, of his negative feelings toward "black people just because they're black." We condemn these statements not because counsel chose to discuss the topic of race in voir dire, which is permissible, but because he did so in a manner that fatally compromised his ability to effectively represent Davis in his capital trial and created a reasonable probability of unreliable convictions.
*256 "[A] capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." Turner v. Murray, 476 U.S. 28, 36-37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). The decision whether to question jurors on feelings about race is within trial counsel's discretion. See id. at 37 n. 10, 106 S.Ct. 1683 ("Should defendant's counsel decline to request voir dire on the subject of racial prejudice, we in no way require or suggest that the judge broach the topic sua sponte.") Recently, this Court held that trial counsel was not ineffective in choosing not to explore the issue of racial prejudice during jury selection in a capital case. See Fennie v. State, 855 So.2d 597, 603 (Fla.2003).
In this case, as in Fennie, see id., the defendant was black and the victim white, and there was no apparent racial motivation for the crime. Instead, the evidence pointed to a theft as the motive for the murder. The victim's silver serving pieces, her purse and wallet, a pearl-handled pistol, some rare coins, jewelry, a ring belonging to her late husband, and her car were taken from her home.
The issue is not that Davis's trial counsel chose to question jurors on their feelings about race but rather what counsel stated about his own racial prejudices. The manner in which counsel approached the subject unnecessarily tended either to alienate jurors who did not share his animus against African Americans "just because they're black," or to legitimize racial prejudice without accomplishing counsel's stated objective of bringing latent bias out into the open. We conclude that counsel's admission of his own racial prejudice constituted deficient performance satisfying the first prong of an ineffective assistance claim.
With respect to both the first and second prongs of the ineffective assistance of counsel claim, there is also evidence in this record to suggest that counsel's expressions of racial bias during voir dire affected his performance in both the guilt and penalty phases of Davis's trial, creating an unacceptable risk that prejudice clouded counsel's judgment and diminished the force of his advocacy.
In the guilt phase, trial counsel rested without presenting a case. While not presenting a defense case in a first-degree murder prosecution is not inherently deficient performance, in making this decision counsel opted not to present two African-American witnesses whose testimony would have implicated others in the murder. Counsel testified that he declined to present the testimony of one of the witnesses, who would have placed two other men at the murder scene with Davis, because he considered a neighbor of the victim who saw Davis approach the victim's house alone to be more credible. The neighbor was white. Asked whether it would have been beneficial nonetheless to place others who may have actually committed the murder at the victim's house with Davis, trial counsel testified during the rule 3.850 hearing that "for some reason it was my decision then that this was not testimony that was going to help me." A second African-American witness would have testified that he participated in helping one of the other men identified by the first witness as being at the victim's house in disposing of bloody clothing at around the time of the murder. Trial counsel testified during the rule 3.850 hearing that he declined to present this witness because he "couldn't get any corroboration or anything that I thought I could use at trial."
Both witnesses would have supported the defense theory that, although Davis may have been present during or immediately *257 after the killing, he did not commit the murder. We view these decisions by trial counsel as additional indications that his judgment may have been affected by improper considerations, consistent with the views he expressed during voir dire.
The grounds on which the trial court found counsel ineffective as to the new penalty phase also support our conclusion that improper racial considerations compromised counsel's representation. We note that in its order granting Davis a new penalty phase, the trial court found that counsel admitted
that he did not obtain Davis' school records, never visited Davis' family or neighborhood, did not talk to his family members, coaches or friends.
[Trial counsel] could, through reasonable diligence, have discovered those mitigation witnesses Davis presented at the evidentiary hearing. Counsel failed to present this additional mitigation evidence at trial....
... Every single bit of mitigation offered may have had a substantial effect on the jury's recommendation of the trial judge's sentence. [Trial counsel] failed to properly investigate and present this available mitigation evidence.
There is simply no explanation why trial counsel would not have explored this type of standard mitigation testimony by visiting Davis's nearby family or neighborhood.
We also note that trial counsel reprised his acknowledgments of racial prejudice in his closing argument during the penalty phase. As asserted by Davis in the postconviction proceedings, these remarks may either have been perceived as an insult by the jurors, none of whom had acknowledged during voir dire that they shared counsel's bias, or implicitly validated any latent racial bias on the part of the jurors.
For all these reasons, counsel's overt admissions of racial prejudice compromised his representation to such an extent that it has undermined our confidence in the guilty verdicts. Thus, we conclude that Davis has also met the standard for prejudice, in that because of counsel's deficient performance, "the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S.Ct. 2052. Accordingly, we reverse the trial court's order denying Davis's motion to vacate his convictions and remand for a new trial.[3]
It is so ordered.
ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, CANTERO, and BELL, JJ., concur.
ANSTEAD, C.J., concurs with an opinion.
QUINCE, J., recused.
ANSTEAD, C.J., concurring.
I fully concur in the majority's opinion that trial counsel's conduct in this case constituted a patent deficient performance which prejudiced Davis to the extent that we can have no confidence in the outcome of his trial. I write separately to praise the prospective jurors in this case for their enlightened responses to trial counsel's blatantly improper questions and statements.
Despite trial counsel's persistent attempts and invitations to elicit admissions of racial prejudice from the panel during voir dire, the panel members were steadfast in their rejection of counsel's assumptions and in their refusal to allow Davis's race to become a factor in the case they *258 might soon hear. The following exchanges demonstrate the panel's integrity and refusal to take the "bait" offered by counsel:
Prospective Juror Read: I get angry with people but never because of the color of their skin.
Counsel: OK, Mr. Davis, do you?
Prospective Juror Davis: Hart.
Counsel: Mr. Hart, I'm sorry. Mr. Hart?
Prospective Juror Hart: I don't agree with you at all. I was born and raised in Brooklyn, New York. I was born and raised with black people. They were my best of friends when I was growing up. I judge everybody as they are. I don't care what color their skin is. That's very unfair.
Counsel: You know what I'm saying, Mr. Hart?
Prospective Juror Hart: Yeah, but I don't agree with you on it. I'm sorry, I just don't agree. You judge people for who they are, not what color skin they have. There's bad white people, too, and Spanish and Mexican, Asian. We all have our faults.
....
Counsel: This is a young black man that's asking you for justice.
Prospective Juror Vasquez: Uh-huh.
Counsel: You think you can give it to him?
Prospective Juror Vasquez: Same as a white person, yes. It's whether they're guilty or not.
Counsel: OK. Ms. Strong, how do you feel?
Prospective Juror Strong: I feel I could give him justice, too. I used to teach kindergarten kids, they're black and white and Mexican. We all got along, no problems.
Counsel: OK. Mr. O'Leary?
Prospective Juror O'Leary: I went in the service in the early fifties when it was probably one of the only truly integrated organizations in the United States, and I spent 20 years there. I've been a teacher at the college ever since with both black and white students. I have no problem whatsoever with that, I really don't.
It is of the utmost importance that racial prejudice not enter into Florida's courtrooms. Attorneys, judges and all citizens must be the bearers of this standard. Today though, I acknowledge with great pride, the example set for us all by the citizen jurors who stood in for us in this case. We, as Americans and Floridians, have much to be thankful for. But we should be especially thankful for the courage and conviction of these citizens to reject counsel's improper suggestion that they must surely suffer from the same affliction that he had. They were on the front line with no warning of what was to come, yet they rose to the occasion.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.
[2] The records on appeal in this case and in Davis's direct appeal do not reflect any challenge to the composition of the venire or Davis's jury. During the hearing on Davis's motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, trial counsel acknowledged that no African Americans served on the twelve-person jury that found Davis guilty of murder and recommended the death penalty.
[3] We do not address the additional issues raised in the State appeal and Davis's cross appeal and habeas petition because these issues are rendered moot by our decision herein.