922 So.2d 182 (2005)
William Frederick HAPP, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-1890.
Supreme Court of Florida.
December 8, 2005.
Rehearing Denied February 13, 2006.
*183 Bill Jennings, Capital Collateral Regional Counsel  Middle Region, Carol C. Rodriguez and Robert T. Strain, Assistant CCRC  Middle Region, Tampa, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
William Happ, a prisoner under a sentence of death for a conviction of first-degree murder, appeals an order of the circuit court denying his amended motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm.

FACTS AND PROCEDURAL HISTORY
The underlying circumstances of the case against Happ are set out in this Court's decision in Happ's direct appeal.
[O]n May 24, 1986, a fisherman found the partially clad body of a woman on the bank of the Cross-Florida Barge Canal in northwest Citrus County. The woman's shoulders were covered by a tee shirt that was pulled up to her underarms, and a pair of stretch pants were tied tightly around her neck. The medical examiner testified that her face and skull were badly bruised and hemorrhaged, that she had multiple scrapes on her back and right heel, that she had suffered ten to twenty hard blows to the head, and that she had been anally raped before death. The cause of death was found to be strangulation.
The victim had driven from Fort Lauderdale to Yankeetown to visit a friend. Several newspaper carriers claimed to have seen a small car at a Cumberland Farms store in Crystal River *184 at approximately 2:40 a.m. on May 24, and to have heard a woman scream at approximately the same time. The victim's car was found on May 25 at a restaurant on U.S. Highway 19, approximately six-tenths of a mile south of the Cumberland Farms store. The window on the driver's side of the car had been shattered. The glass from the car was consistent with glass found at the Cumberland Farms store and at the canal where the victim's body was found. A shoe print found outside the driver's side of the car was later found to match one of Happ's shoes. Happ's fingerprints were also found on the exterior of the car.
Happ v. State, 596 So.2d 991, 992 (Fla.), vacated, 506 U.S. 949, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). Happ was indicted for first-degree murder, burglary of a conveyance with a battery therein, kidnapping, and sexual battery likely to cause serious personal injury. Id. Happ's first jury trial ended in a mistrial after the prosecutor violated an order in limine. Id. Prior to the second trial, Happ filed a motion to dismiss the indictment on double jeopardy grounds based on the trial court's finding of the prosecutor's intentional misconduct in violating the order in limine. Id. The motion to dismiss was denied. On retrial, the jury convicted Happ on all counts and recommended the death penalty by a vote of nine to three. Id. at 992-93. The trial judge subsequently sentenced Happ to death for the murder of the victim and to three consecutive life sentences on the other three counts. Id.
On direct appeal, this Court affirmed Happ's convictions and sentences, including the sentence of death, but disapproved the aggravator of cold, calculated, and premeditated (CCP) as unsupported by the evidence. Id. at 997. The United States Supreme Court vacated the judgment and remanded the case to this Court for further consideration in light of Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), concerning the jury instruction for the heinous, atrocious, or cruel (HAC) aggravating factor. See Happ v. Florida, 506 U.S. 949, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). On remand, this Court found a challenge to the instruction on the ground of vagueness had not been preserved for review and ruled in the alternative that the reading of the defective instruction was harmless and could not have affected the jury's recommendation. See Happ v. State, 618 So.2d 205, 206 (Fla.1993).
Happ filed an amended motion for postconviction relief on October 12, 1995, in which he raised thirty-two claims.[1] After *185 an evidentiary hearing on an alleged Brady violation, the trial court denied all of the claims asserted in Happ's motion for postconviction relief, and Happ appealed. Happ, 784 So.2d at 1094. Subsequently, by an order dated September 13, 2000, this Court affirmed the trial court's order as to most claims but dismissed the appeal without prejudice to allow Happ to further amend his 3.850 motion on four issues: (1) his counsel's failure to investigate the origins of an unknown hair sample; (2) his counsel's failure to investigate and present mitigating evidence; (3) his counsel's failure to object to or otherwise challenge the State's case; and (4) whether DNA evidence demonstrated Happ's innocence. Id. at 1094 & n. 4.
Prior to the issuance of this Court's September 13, 2000, order, Happ filed a petition for a writ of habeas corpus, in which he alleged four claims based on ineffective assistance of appellate counsel. Id. at 1094-95. On October 31, 2000, Happ filed a supplemental petition for habeas relief, alleging an additional instance of ineffective assistance of appellate counsel. Id. at 1095. All of these claims were denied. In our opinion denying the habeas petition, we corrected a statement in respect to the shoe print that had been incorrectly stated in our opinion on the direct appeal of Happ's conviction and sentence. Id. at 1098.[2] We specifically held that the corrected facts did not significantly alter the events that were believed to have occurred in this case.
Pursuant to our order, Happ filed a second amended motion for postconviction relief on November 8, 2000. On March 30, 2001, a hearing was held pursuant to Huff v. State, 622 So.2d 982 (Fla.1993). At the Huff hearing, the trial court determined that an evidentiary hearing should be held as to the claims arising out of the four issues referred to in this Court's order on remand. An evidentiary hearing was held on May 12 through 14, 2003. Following the hearing, the trial court denied all *186 claims.[3] Happ filed a notice of appeal for review in this Court, asserting that the trial court erred in denying several of his claims.[4]

INEFFECTIVE ASSISTANCE OF COUNSEL
In ineffective assistance of counsel claims, we have repeatedly held that a defendant must prove two elements: first, that counsel's performance was deficient; and second, that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Recently, we explained this standard in State v. Davis, 872 So.2d 250, 253 (Fla.2004):
Claims of ineffective assistance of trial counsel require a showing of deficient performance and prejudice. See generally Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, a defendant must establish conduct on the part of counsel that is outside the broad range of competent performance under prevailing professional standards. See Gore v. State, 846 So.2d 461, 467 (Fla.2003). Second, the deficiency must be shown to have so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined. See id. The two prongs are related, in that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Rutherford v. State, 727 So.2d 216, 219 (Fla.1998) (quoting Strickland, 466 U.S. at 686, 104 S.Ct. 2052). In reviewing a trial court's ruling on an ineffective assistance claim, this Court defers to findings of fact based on competent, substantial evidence and independently reviews deficiency and prejudice as mixed questions of law and fact. See Gore, 846 So.2d at 468; Stephens v. State, 748 So.2d 1028, 1033-34 (Fla.1999).
In reviewing claims of ineffective assistance of counsel, we respect the lesson of Strickland, 466 U.S. at 689, 104 S.Ct. 2052:
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because *187 of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, [350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)].
We have further held that the defendant bears the burden in establishing this claim. Zakrzewski v. State, 866 So.2d 688, 692 (Fla.2003).

Ineffectiveness as to Alibi Witnesses
In his first claim, Happ argues that he was denied effective assistance of counsel because his counsel failed to object to leading questions and did not effectively cross-examine defense alibi witness Vincent Ambrosino and further his counsel failed to call an available defense alibi witness, Carlos Quinones. After an evidentiary hearing, the trial court denied Happ's claim as to counsel's failure to call Quinones, expressly finding that counsel's performance could not be deficient because Quinones' testimony was not "relevant." The trial court also denied the claim as to the failure of counsel to object when the State allegedly asked Ambrosino leading questions.
This Court has reviewed the trial record and the record of the evidentiary hearing. Based upon this review, the Court has concluded that the trial court's denial of relief on this basis should be affirmed.[5] We do so based upon the following record and for the following reasons.
Ambrosino was a State witness during the trial. At the time this murder occurred, Ambrosino lived in his mother's home in Crystal River. Ambrosino's stepfather, Carlos Quinones, and two other younger children also resided in Ambrosino's mother's house at the time.
Ambrosino met Happ about a month before the night of the murder, which occurred in the early morning hours of Friday, May 24, 1986. Happ had been in Crystal River since March of 1986 and was living at the home of his great aunt, Edna Peckham. Mrs. Peckham's house was north of Crystal River and south of the barge canal[6] in a wooded area close to Highway 19.
*188 Ambrosino became acquainted with Happ at the bowling alley in Crystal River, which was located a short distance from Ambrosino's mother's house. Ambrosino and Happ became friendly and got together every day that month. Most days, they went to the bowling alley.
While living at Mrs. Peckham's home, Happ found work as a painter and wallpaper hanger. Mrs. Peckham bought a truck so that Happ could get to work. However, a day or two before the night of the murder, Mrs. Peckham took the truck away from Happ because she found that the truck was low on oil.
Ambrosino testified that Happ was supposed to pick him up from his work at McDonald's on Wednesday, May 21, but because Happ had no truck, Happ did not pick him up. Rather, Ambrosino met Happ "around the corner on [Highway] 44" in Crystal River, and they went from there to the bowling alley. After leaving the bowling alley on that Wednesday evening, Ambrosino and Happ each went their separate ways.
Ambrosino and Happ were next together on Thursday evening, May 22. Ambrosino's testimony during the retrial was:
Q [BY THE STATE] The next day, Thursday, did you see Mr. Happ again on Thursday?
A Yes.
Q And where did you see him that day?
A Maybe at my house or at the bowling alley.
Q You don't exactly remember where?
A No, not exactly for sure.
Q Do you remember whether or not that Thursday night he actually spent the night at your mother's house with you?
A Yes.
Q He did?
A He spent all night.
Q Okay. And that 
This was after you all had met and been wherever you'd been, you don't really remember but you know he spent Thursday night with you.
A Yes.
Q As a result of him having spent Thursday night with you, was there any friction between you and I think it's your stepfather?
A Yes.
Q Or was your stepfather at that time.
And what was that friction?
A He had to get up in the morning and I had woke him to ask him if my friend could stay the night.
Q You woke him up Thursday night and asked him if Mr. Happ could spend the night. He got upset because you woke him and he was going to have to get up and go to work the next day?
A Yes.
Q The next day would have been Friday, and now we're talking about the 21st, Thursday the 22nd, Friday the 23rd of May, 1986.
You and Mr. Happ I assume got up, you're at your mother's house. Do you remember what you did that day?
A Went to the bowling alley and about 11:00-11:00 o'clock or so, we started walking home.
Q This is 11:00 o'clock in the evening now?
A Yes, p.m.
Q Had you considered Mr. Happ's spending the night at your house again on Friday night?

*189 A I considered it but I didn't want to up  I didn't want to have any more friction with my stepdad.
Q You didn't ask him to spend the night Friday night?
A No.
Q Friday night, May the 23rd, where was the last place that you saw Mr. Happ?
A On Holiday Drive and 44.
Q And could you on the map again point out to us where that location is? Can you find it?
How about right here (indicating)?
A Okay.
Q Would that be just a little bit to the left of the dot, the dot then would be Manatee Lanes; right? That's the bowling alley?
A That's right.
Q Right in that area (indicating)?
A Yes.
Q Which way was Mr. Happ headed when you last saw him?
A Toward this direction, toward his house.
Q Okay. Do you know where he lives or where he was living at that time?
A He lived down Highway 19. It was down around back in the woods.
Q Okay. Would it have been up towards the barge canal?
A Yes, down toward that way (indicating), but not as far as the barge canal.
Q Okay. And what time of evening was this?
A Around eleven.
Q Eleven p.m.?
A P.M.
Q This is Friday night?
A Yes.
Q The next morning which would have been Saturday morning, May the 24th, did you have the occasion to see Mr. Happ again?
A Yes, he came over in the morning.
Q Saturday morning?
A Around nine o'clock.
Q Okay. When he came over that morning, did that cause any problems between you and your stepfather again?
A Yes, he didn't  he had a rule he didn't want any company over before 10:00 o'clock on the weekends.
Q Okay. And he was off that Saturday?
A He didn't go to work, no.
Q And that 
Was it not unusual for him because he usually works on Saturday?
A Right.
Q He usually works Saturday and is off Sunday and Monday?
A Right.
Q This particular weekend he had Saturday, Sunday, and Monday off?
A Yes, sir.
Q When you saw Mr. Happ this was again at your mom's house on Gum Street, right off of Gum Street, in Crystal River; is that right?
A Yes.
Q When you saw him there that morning, did you notice any injuries to either one of his hands?
A I believe his right hand was swollen. He told me he hit a tree. His grandmother (sic) took his truck away, and he had to walk home in the middle of the night.
Q Got mad and hit a tree?
A Yes.
Q And did you actually see his hand red and swollen?
A Yes, he showed it to me.

*190 Q This now was on Saturday morning at about 9:00 o'clock, May the 24th, 1986.
A Yes.
Following this direct-examination testimony, Ambrosino was cross-examined by defense co-counsel Mark Nacke. Defense counsel elicited in detail that Ambrosino had stated to the Sheriff's investigator in February of 1987 that Happ had spent the night at Ambrosino's mother's house on the night of Friday, May 23, not on the night of Thursday, May 22, and that Happ showed up again on Sunday, not on Saturday morning. Defense counsel further brought out that Ambrosino had testified in a deposition in October 1988 that Happ had spent the night on Friday night, not on Thursday night.
Prior to the trial, the defense filed a notice of alibi witness pursuant to Florida Rule of Criminal Procedure 3.200. In this notice, defense counsel listed Happ's great aunt, Mrs. Peckman, as an alibi witness. After the State rested, the defense called Mrs. Peckham, who testified that in May of 1986, Happ was living at her home with her and her sick husband. At that time, Mrs. Peckham's husband was bedridden and had cancer and Alzheimer's disease. He had also suffered a stroke, which rendered him unable to speak.
Mrs. Peckham testified that Happ was at her home on the evening of May 23 and into the morning hours of May 24. According to Mrs. Peckham, Happ had been in her home for dinner on the evening of May 23 and did not go out after dinner. She was up and down all that evening, taking care of her ailing husband. She further testified that Happ was in her home when she awoke the next morning at 6 a.m. She testified that she was able to determine the date because she had taken the truck away from Happ on May 22.
In closing, defense counsel argued that Mrs. Peckham's testimony had established that Happ was at her home on the night of the murder. Specifically, lead defense counsel Jeffery Pfister first addressed Ambrosino's constantly changing testimony in conjunction with Mrs. Peckham's testimony, stating:
Okay. Now what does Vince Ambrosino really tell us? He was first interviewed eight-nine months after May of 1986. What does he tell you? First he says  he's got four stories. First, he says [Happ] was with him on Friday night which that's what he first told law enforcement. The defense attorneys weren't there, we weren't messing him up.
Story number one: Bill was with me on that Friday night.
The State said, well, let's look at your father's work record, see what that shows. He says okay. That fixes it in my mind, okay, it was Thursday night. That's story number two.
Mr. Nacke, my co-counsel, takes his [Ambrosino's] sworn statement October 25, of '88. He then says, yes, I looked over all the records, I'm certain, the statement out in California  prosecutor was there  he says, yes, he was there on Friday night. All the testimony, he was there with him on Friday. He says it was Friday night.
He gets into court, I'm refreshed again, I'll say he wasn't with me on the night of the 23rd, it was the night of the 22nd. State's own witness.
Mr. Happ has an alibi for this crime [Mrs. Peckham]. He did not commit it. Mr. Pfister later elaborated on the alibi testimony, stating:
The evidence he gave you established that for sure he was around on the 23rd, the night of the 23rd of May, 1986. He was home.

*191 She [Mrs. Peckham] explained to you how she knew for sure. She knew from the receipt from the truck repair, the truck maintenance. That refreshed her memory.
She is not like Vince Ambrosino trying to pull something out of the air nine or ten months later.
She was questioned earlier in August, a couple of other times, she didn't know then. The facts came to her when she was selling the car, and that's when it came back to her.
. . . .
One last piece of evidence, Mrs. Peckham's phone bill.
. . . .
5-24, that's in the morning of the 24th, 8:12 a.m. Call was for thirteen minutes. 5-24. 5-24, that's Saturday morning, 8:12 a.m. That's not someone making this up because she's his grand  related to him, he's her grandnephew. A thirteen-minute phone call. She didn't make it. She didn't know this number.
Here's the evidence, folks, Sharpsville, PA. Thirteen-minutes, 5-24. Twelve-thirteen minutes, 8:12 in the morning. Thirteen minutes, 8:25 a.m.
She testified he was home that day. He was home all night. She was up and down with her sick husband. That's what she was there for. For thirteen minutes, he was making a call. That's there. I can't change it. She didn't make it. She didn't make it.
At the rule 3.850 evidentiary hearing, the defense called Carlos Quinones, who was Ambrosino's stepfather. Mr. Quinones testified that he was brought to Florida by the State in 1989 while Happ's trial was being held and the State took his testimony in a deposition where counsel for both parties were present. In the deposition, Mr. Quinones testified that Happ had been at Ambrosino's mother's home on the evening of May 23 and had slept next to his stepson that evening in the living room of that home. Mr. Quinones testified that he last saw Happ on the evening of May 23 at no later than 11 p.m. and next saw Happ at "quarter to 6 in the morning." Mr. Quinones was not called by either party to testify at the trial.
During the trial, Happ was represented by lead counsel Pfister and co-counsel Nacke. At the rule 3.850 hearing, Mr. Pfister was not called as a witness. Mr. Nacke was called as a witness by the defendant and was questioned about why Mr. Quinones was not called during the trial.
Q Okay. Can you tell the Court why Mr. Quinones was not called to testify at Mr. Happ's trial?
A I don't have any recollection of why not.
Q Okay?
A I would say that if we brought him there and he maintained that testimony that he did in his deposition, that we would have called him. There must have been some reason, but what that is, I don't know, because I can't imagine with him saying that on a deposition, and we had called other witnesses, we would not be losing opening and closing arguments, so that wouldn't be a reason not to call him, after bringing him down from New York, I know there must have been a reason, but I cannot tell you that I remember why.
In the trial court's amended order of November 5, 2003, denying the rule 3.850 motion, the trial court held, "There is no deficient performance in failing to call witnesses who are neither credible, i.e. LaVenture, reliable, i.e. Partykas, or relevant, i.e. Quinones." The trial court erred *192 in not providing its reasoning in respect to Mr. Quinones.[7]
However, based on our complete review of the record, we affirm the trial court's decision to deny the 3.850 claim of ineffective assistance of counsel because Happ has failed to establish that his trial counsel was deficient in failing to call Mr. Quinones as an alibi witness.
We reach this conclusion for several reasons. First, trial counsel did present an alibi witness, Mrs. Peckham, whom the defense noticed as its alibi witness prior to trial. After the trial had already commenced, the State brought Mr. Quinones to Florida to testify, and he was deposed during the trial. Although his testimony could also have been presented as alibi testimony, it was in direct conflict with Mrs. Peckham's alibi testimony. Based on this conflict, it is clear that defense counsel could not call both Mrs. Peckham and Mr. Quinones.
Secondly, choosing to call Mr. Quinones rather than Mrs. Peckman would have created self-evident problems for the defense. In the State's case, Ambrosino testified that Happ had been at his mother's house on Thursday, May 22, not on Friday, May 23. Mr. Quinones' testimony would have been in conflict with Ambrosino's testimony as to the night on which Happ had spent the night with Ambrosino. There was no such conflict between the testimony of Mrs. Peckham and that of Mr. Ambrosino. Additionally, Mr. Quinones could not testify as to where Happ was during the crucial period of 11 p.m. to 5:45 a.m. Mr. Quinones testified that he did not see Happ during that period. As an additional matter, Mrs. Peckham was noticed as Happ's alibi witness, and Mr. Quinones was not.
Finally, in the postconviction hearing, Happ did not call the lead defense counsel. The defendant only called Mr. Nacke, who testified that there was a reason that he and Mr. Pfister did not call Mr. Quinones, but he could not recall what the reason was. Based on this record, postconviction defense counsel has presented no basis for us to conclude that the failure to call Mr. Quinones was ineffective.
As to the parts of the claim that defense counsel failed to object when the State asked Ambrosino leading questions and that defense counsel failed to effectively cross-examine Ambrosino, we likewise conclude that the trial court's denial of the claim of ineffectiveness should be affirmed. Many of the questions which are the basis of this claim are not leading questions.[8] This Court has long held that a question is not necessarily leading simply because it calls for a "yes" or "no" answer. Fla. Motor Lines Corp. v. Barry, 158 Fla. 123, 27 So.2d 753, 756 (1946). Instead, a question is leading when it points out the desired answer. Id. In respect to those questions which are leading in the context of Ambrosino's direct examination, it was not demonstrated that counsel was ineffective so as to breach the Strickland standard or that there was Strickland prejudice. Nor do we find that counsel's cross-examination was in violation of the Strickland standard or that there was Strickland prejudice.

Failure to Investigate a Negroid Hair Sample
In his next claim, Happ contends that his counsel was ineffective for failing to *193 investigate and sufficiently argue exculpatory evidence pertaining to a negroid pubic hair that was found underneath a pair of sweatpants which were tied tightly around the victim's neck. At the trial, defense counsel presented evidence about the unknown hair, and the State rebutted this evidence with two theories: the pubic hair had gotten on the victim's sweatpants at a public restroom or that it was transferred via use of a used sponge by an assistant at the medical examiner's office. During the evidentiary hearing on this postconviction claim, counsel for Happ questioned Mr. Nacke, Happ's trial co-counsel, about the failure to investigate this claim. Mr. Nacke explained that trial counsel did not have any African-American suspects in the case with whom they could make a comparison other than the man who worked for the medical examiner's office. The postconviction court denied this claim, stating that defense counsel was aware of this unknown hair and made an unsuccessful search to find an African-American other than the medical examiner's assistant with whom to make a comparison. The court concluded, "Everything in this record supports their diligence in investigating this issue."
We find no basis for reversing this ruling. Trial counsel made a strategic decision not to have the unknown hair compared to the individual at the medical examiner's office. If the hair remained unknown, the defense had a basis for arguing that there was an unknown assailant who was responsible for the crime. However, the defense would have been unable to present this possibility if the hair had been matched to the medical examiner's assistant. Happ is not entitled to relief on this claim.

Failure to Present Mitigation Evidence Regarding Happ's Drug Abuse History
Happ also alleges that his trial counsel was ineffective during the penalty phase for failing to present mitigation evidence concerning his drug abuse history. The trial court denied this claim after the evidentiary hearing as follows:
Appellant called Alexander Martin who was qualified as an expert within the field of psychopharmacology and addictions and the general effects of drugs on the human brain. Happ self-reported significant poli-substance usage during Martin's first interview of March 21, 2000.
This witness['s] testimony is totally unpersuasive because he does not make a diagnosis. There was no independent corroboration of Happ's self-reported cocaine usage. This witness did not ask Happ what drugs he was using May 23, 1986, the date of the murder. Nor did he ask him if he [Happ] was under the influence of cocaine and cocaine psychosis when he murdered Angela Crowly.
(Citations omitted.) At the evidentiary hearing, trial counsel testified that he did not believe that a jury in Lake County would accept drug usage as a mitigating factor, particularly where it was not tied into the crime. Happ has failed to meet his burden or otherwise demonstrate that the postconviction court erred. We deny this claim.

Failure to Utilize Expert Witnesses
Happ contends that his trial counsel was ineffective in failing to call various experts and witnesses relating to whether Happ could have broken the window with his hand,[9] as well as a forensic pathologist to *194 rebut the medical examiner's testimony. First, Happ alleges that counsel should have presented a forensic expert and an orthopedic surgeon to rebut the suggestion that Happ broke the car window with his fist. At the evidentiary hearing, Happ presented testimony from Paul Kish, a person who conducted tests on glass by breaking a similar type of car window with a hammer. The video showed that the person breaking the window was unsuccessful on his first attempt, and when he did succeed, the glass fell outside of the car, not into the car. However, the window was not from the same make or model car; the expert did not measure the force that it took to break the window; he broke the window while it was much colder and was snowing; and the expert was not sure if the window was in the same position as the victim's car window, despite the fact that he recognized this could impact the results of the test. Counsel for Happ also presented the testimony of Dr. Peter Lopez, who testified that hypothetically, it is unlikely that one could punch a car window with his hand to such an extent as to cause the window to shatter and that even if that person was successful in doing so, he would likely injure his hand, including injuries like superficial to deep lacerations, a significant contusion, or even a fractured metacarpal. Happ also contended that his counsel should have presented his employer, who could have testified that he did not observe any injuries to Happ after the crime. Finally, Happ alleged that his counsel was ineffective in failing to hire a forensic pathologist or vigorously cross-examine the medical examiner.
The postconviction court denied this portion of the claim as follows:
At the evidentiary hearing, the Appellant presented testimony of three (3) experts; Kish, Lopez, and Petraco in an attempt to rebut the State's original trial evidence regarding the impact of outer glass breakage of an automobile, trace evidence, and the lack of Negroid hair fragments in the victim's automobile carpet sweepings.
The entirety of their evidence was and is either irrelevant or inadmissible at trial. Mr. Kish's testimony and contribution to this Defendant's theory was to that he conducted a test on a similar type of automobile wherein a driver's side window was broken by means of a hammer. The test window was no[t] measured by Mr. Kish nor was the amount of force necessary to break the glass. The aforementioned testing technique and methodology would not have survived a challenge at trial per Frye [v. United States, 293 F. 1013 (D.C.Cir. 1923)].
Dr. Lopez's testimony that a punch-type of injury by a human hand to an automobile driver's side window would likely result in a swollen hand would have corroborated Ambrosino's original trial testimony that Happ had a swollen right hand the day after the killing of Angela Crowly. Dr. Lopez never examined Happ's hand.
(Citations and footnotes omitted.) We find that the postconviction court's conclusions are supported by the record. Moreover, during the evidentiary hearing on the postconviction claim, Mr. Nacke explained why he did not hire a glass expert during the trial.
My recollection was that we did discuss a glass expert, and after we evaluated what the State's expert could actually say and that was that this glass that they had uncovered as supposed evidence was in the same batch or the same type of glass as the victim's side window, I think it was the driver's side window. They would not say that this was a quote match; that it just came *195 from the same batch or, you know, the same type, different cars, would have that same type of glass in it, because it's not unique to any one particular automobile. So, based on that, there was no proof that we could determine that this was, in fact, the actual glass from the victim's car.
In other words, the nature of the evidence presented by the State was not such that defense counsel believed that he needed to rebut it. Counsel likewise gave a similar answer to why he chose not to present a shoe expert. The expert presented by the State could not state that Happ's shoe made the shoeprint or that it was even a strong match, just that the pattern on the bottom had the same pattern as one of Happ's shoes. Since there is competent, substantial evidence to support the postconviction court's factual findings and, further, since Happ has failed to show that the court erred relative to its legal conclusions, we deny this claim.

Denial of a Full and Fair Evidentiary Hearing
In the final claim to be addressed, Happ alleges that the postconviction court erred in denying his motion to release the shoes to an expert for further testing. Specifically, postconviction counsel informed the court that they expected their expert witness, Mr. Patraco, to testify that it was physically impossible for the shoeprint near the car to be made by Happ's shoe because it was a different size. Counsel wanted to present this evidence in order to establish that the original trial counsel was ineffective in failing to hire a shoeprint expert. The trial court denied this claim in an order dated November 15, 2002, stating that "defense ha[d] propounded no new theories under which the court felt compelled to release the evidence for testing."
As addressed above, trial counsel had previously asserted that they did not hire a shoeprint expert because they believed that the State's evidence on this issue insufficiently linked Happ to the crime and thus there was no real reason to rebut it. Specifically, during the trial, Ernest Hamm, a crime laboratory analyst with the Florida Department of Law Enforcement, testified relative to the shoeprint evidence. Hamm was given both the negative of the shoeprint left at the crime scene and the shoes seized from Happ in California so that Hamm could compare them. According to Hamm, the shoe he received had a considerable amount of wear in parts, so while it appeared to be the same make and design as the shoe that made the print at the crime scene, he could "only form the opinion [that Happ's shoes] could have made [the print at the crime scene] if there was a time element between the time that this suspect footwear track was made and the time" of the testing.[10] Based upon this record, we cannot conclude that the trial court erred in determining that counsel's decision was not unreasonable. Again, "there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Accordingly, we affirm the trial court's denial of relief on this issue.

CONCLUSION
For the reasons stated above, we affirm the lower court's denial of Happ's rule 3.850 motion for postconviction relief.
It is so ordered.
*196 PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] These claims included: (1) Happ was deprived of effective representation because the Capital Collateral Regional Counsel lacked sufficient funds; (2) public records were withheld from him; (3) the State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and used misleading evidence in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); (4) his counsel was ineffective during the guilt phase; (5) there was newly discovered evidence that Happ was innocent of the crime; (6) Happ's trial counsel was ineffective for failing to assert that the jury instruction on the CCP aggravator violated Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992); (7) his trial counsel was ineffective for not asserting that the jury instruction on the prior violent felony aggravator violated Espinosa; (8) his trial counsel did not challenge whether the HAC aggravator was unconstitutionally vague; (9) Happ's trial counsel did not properly litigate whether the aggravator of "murder committed during felony" was unconstitutionally vague; (10) the trial court failed to find mitigating evidence that was established in the record; (11) the prosecutor made improper and inflammatory comments; (12) Happ's trial counsel did not challenge whether the jury was misinformed of its advisory role; (13) his trial counsel did not challenge whether the penalty phase jury instructions shifted the burden of proof to the defendant; (14) newly discovered evidence established that State witness Richard Miller was working for the State and had lied during his prior testimony; (15) his counsel was ineffective for failing to object to improper prosecutorial comments; (16) Florida's capital sentencing scheme is unconstitutional; (17) Happ's trial counsel did not challenge whether the prosecutor improperly instructed the jury that it must recommend a sentence of death; (18) his counsel was ineffective during the penalty phase; (19) the prohibition in the Florida Bar's Rules of Professional Conduct against interviewing jurors is unconstitutional; (20) juror misconduct occurred; (21) the trial court erroneously admitted illegally obtained statements and evidence; (22) police misconduct occurred; (23) Happ's sentence is unreliable because of Miller's perjured testimony; (24) Happ was denied the ability to present crucial testimony on his behalf; (25) Happ was illegally extradited from California; (26) the State improperly struck jurors based upon the Catholic religion; (27) his trial counsel did not object to the fact that the trial court failed to take a recess before imposing a sentence; (28) the jury was never sworn; (29) the record was in poor condition; (30) cumulative errors deprived Happ of a fair trial; (31) the State unconstitutionally used jailhouse informants to obtain incriminating statements; and (32) his trial counsel did not object to prosecutorial misconduct. Happ v. Moore, 784 So.2d 1091, 1094 n. 3 (Fla.2001).
[2] This Court acknowledged that the Court's prior opinion on direct appeal was inaccurate when it stated, "A shoe print found outside the driver's side of the car was later found to match one of Happ's shoes." Happ, 596 So.2d at 992. Based upon the testimony of the crime analyst who examined the shoe, the analyst's opinion was more accurately that Happ's shoe could have made the impression. The reason that the analyst could not be certain was because the shoe print did not contain enough individual characteristics to differentiate it from any other tennis shoe of the same make and design. Happ v. Moore, 784 So.2d 1091, 1098 (Fla.2001).
[3] An amended order denying Happ's second amended motion to vacate was issued on November 5, 2003.
[4] Happ challenges the trial court's rulings on the following claims: (1) his trial counsel was ineffective for failing to challenge the State's case and for failing to effectively cross-examine an alibi witness and call an available alibi witness; (2) his trial counsel was ineffective during the guilt phase for failing to investigate an unknown negroid hair sample and argue its exculpatory value; (3) his trial counsel was ineffective during the penalty phase by failing to investigate and present mitigation regarding Happ's drug abuse history; (4) Happ was denied a full and fair evidentiary hearing because the trial court denied his request to permit expert tests of Happ's shoes and refused to permit proffered evidence of expert witnesses relating to the shoeprint evidence; and (5) his trial counsel was ineffective for failing to hire and use sufficient expert witnesses to challenge the State's case.
[5] The briefs of appellant and the State, as well as statements during oral arguments in respect to this issue, were inadequate and not helpful to the Court in resolving this issue. Counsel was specifically asked by the Court at oral argument what had been Happ's defense at the trial. Counsel did not advise the Court that Happ had presented his great aunt, Edna Peckham, as an alibi witness. This was a serious error by both counsel. This Court relies upon counsel to be knowledgeable about the record and to be candid about the record in their briefs and in oral argument. See R. Regulating Fla. Bar 4-1.1; 4-3.3.

In this case, the significant point argued in the briefs and at oral argument was the failure of trial counsel to call Carlos Quinones as an alibi witness to testify that Happ was at the house at which Mr. Quinones lived on the night of the murder. Counsel had an obligation to present all crucial material facts to the Court, including the fact that Happ filed a pretrial notice identifying Mrs. Peckham as an alibi witness, that defense counsel called Mrs. Peckham to testify that Happ was at Mrs. Peckham's house on the night of the murder, and defense counsel argued Mrs. Peckham's testimony in closing argument.
Postconviction defense counsel did not address this issue with the candor which the Rules of Professional Conduct require and which this Court expects and requires. Postconviction counsel for the State failed to demonstrate the knowledge of the record which this Court expects and requires. Counsel are admonished for these failures.
[6] The barge canal was where the victim's body was found on the morning of May 24, 1986.
[7] We are aware that defense counsel did not argue this issue until pages 52 and 53 of their 59-page written closing argument. There was no reference to Mrs. Peckham's testimony in the State's written closing argument.
[8] Earlier in this opinion, we set out the questions to Ambrosino which are the basis for this claim.
[9] Ambrosino testified that when he saw Happ at approximately 9 a.m. on May 24, Happ's hand was swollen.
[10] It was this testimony that was the basis of our correction. See supra note 2; Happ v. Moore, 784 So.2d 1091, 1098 (Fla.2001).