# Supreme Court of Florida

_____

No. SC17-1486
_____

**CECIL SHYRON KING,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 20, 2018

PER CURIAM.

Cecil Shyron King appeals the postconviction court's order denying in part his motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. *See* art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the postconviction court's order denying King's guilt phase claims, vacating King's sentence of death, and remanding for a new penalty phase based on *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017).

# FACTS AND PROCEDURAL BACKGROUND

This Court explained the facts of the underlying murder and trial on direct appeal:

> Renie Telzer-Bain's family last saw her alive on Monday, December 28, 2009, at 5:30 p.m., when her daughter-in-law, Lyza Telzer, along with Lyza's son and Lyza's son's friend, visited her. Lyza and Renie were very close, spoke multiple times per day, and saw each other five times per week. Lyza made a point of seeing Renie very often because of Renie's age and because Renie lived by herself. Renie liked to stay up late watching television and to sleep in until 10 or 11 a.m.
>
> The next day, Tuesday, December 29, Lyza began trying to reach Renie around 4 p.m. As the day progressed and she had not been able to reach Renie, Lyza became concerned. She called Renie's neighbor to ask if he would keep an eye out for Renie. The neighbor had noticed that Renie's garage door was open at 10:30 a.m. that morning and that her car was missing. He believed at the time that Renie had inadvertently left the garage door open, and either he or his wife closed it.
>
> Lyza went to Renie's house around 7 p.m., along with Renie's neighbor. The garage door was closed, and when Lyza opened the garage, Renie's car, a 2001 Cadillac, was missing. The door from the house to the garage was locked, which was unusual because Renie only locked that door at night. The neighbor pried open the door, and they entered the house. Upon entering the house, Lyza believed a burglary occurred—the house was ransacked, and Renie was an extremely neat, meticulous person who always kept her house in order. Lyza and the neighbor then discovered Renie's body in the bedroom on the floor.
>
> The sliding glass door was opened about an inch, and the frame was damaged. The pole that normally kept the door from being opened was not in the door. Numerous items were missing from the house, including a flat screen television, silverware, jewelry, wallets, clothing, purses, cosmetic bags, a tool chest, and weekly and monthly planners with Renie's handwriting in them. Subsequent investigation by law enforcement revealed no fingerprints of value in the house.

Investigators found a container of cantaloupe on the kitchen table. On the top of the container was a piece of fruit that appeared to have a bite mark, which was swabbed for DNA. Lyza testified that Renie often kept cantaloupe or fruit in containers in the fridge. The DNA swab from the fruit revealed a partial male DNA profile (with eleven of thirteen loci being identifiable).

Shoe prints were discovered on the exterior garage door, where it appeared that someone had tried to kick the door in. Additional shoe prints were found near the entry where the yard was fenced in. The size of the prints indicated a large-sized shoe.

Dr. Rao, a medical examiner, testified that the cause of death was blunt head trauma. The victim had been struck at least seventeen times with the head and claw of a hammer, sustaining injuries on the back of her head, to the front of her neck, on the back of her neck, on her upper back, on the back of her right hand, on her right leg, and on her left knee. Three of the blows were to the head, which would have been fatal and rendered the victim unconscious. The wounds on the victim's right hand and left arm were defensive wounds, sustained as the victim was trying to ward off blows.

The missing Cadillac was found the day after Renie's body was discovered, located within a few blocks of King's apartment. Fingerprints found inside the car matched those of Rashad Montford, King's cousin. Police subsequently interviewed Montford, who explained that he borrowed the car from King. According to Montford, he went to King's apartment in late December 2009, and King offered to let him borrow a newer model Cadillac, which was parked around the corner. King did not explain where he had gotten the car, and Montford did not ask. Montford borrowed the car twice that day. While he was borrowing the car, Montford called King at one point to tell him that he was going to be out with the car for a little while longer. Police corroborated this call using phone records. King instructed Montford to leave the vehicle a few blocks away from where King lived when he returned it.

While he was speaking with police, Montford offered to wear a recording device and visit King to get him to talk about the vehicle, with the aim of clearing Montford's name. Montford visited King twice while wearing the recording device, but King did not admit that he had given Montford the car. King instructed Montford to "say you don't know" when questioned by police about the vehicle. King's fingerprints were not found inside the Cadillac.

James Roman testified that he was the owner of a residential lawn service company that had serviced Renie's yard for four or five years. King worked for Roman from July until October 2009. Roman and King cut Renie's yard together eight or ten times. Roman always went with King to cut Renie's yard. King did not have a vehicle, so Roman would sometimes give him a ride. Roman made it a point not to go inside his clients' residences, and Roman testified that King never went inside Renie's house. Roman does not believe that King ever met Renie. Renie never came outside to give them food or drinks, and she paid Roman by leaving a check under the door mat.

Roman was out of town at the time of the murder. While out of town, he received a phone call from King, who mentioned that something had happened to one of the clients for whom Roman worked. King usually only called Roman to speak about work.

On January 8, 2010, King pawned a gold bracelet, identified as belonging to Renie, for $300. The bracelet did not have any unique identifiers, such as charms or initials. The lead detective testified that it would be a good item to pawn if King was trying to stay under the radar.

During the investigation, police checked the phone records for King's cell phone. On the morning of the murder, he made a phone call at 5:24 a.m. The phone call was routed using a tower that was near the bus station downtown, three miles away from his residence. Normally a phone call bounces off the cell tower that is closest to the person making the call. If King was home at the time of the phone call, there was a high likelihood that the phone call would have routed through a different tower. No other calls were made until 10:10 a.m., and that phone call routed through a tower that was closer to King's residence. Police went to the bus station and determined that there was a bus route that left the station and stopped directly across from the entrance to Renie's subdivision. On the day of the murder, there was a bus leaving the bus station on that route at 5:25 a.m. The bus driver confirmed that the bus ran on schedule on that particular day, but stated that he would be unable to identify King because it was rush hour.

Police executed a warrant on King and searched his residence on February 1, 2010. Numerous items belonging to Renie were found in his residence. The items included a pillow case sham that matched a sham seen at Renie's residence, day planners with Renie's handwriting inside, items of clothing with the tags still on them,

silverware, a chess set, purses, watches, rings, pearls, necklaces, and other jewelry. Police also found a hammer on top of King's microwave; however, the hammer did not have any blood on it. Large-sized shoes were recovered from King's house, but none of the shoes matched the tread found in the shoe prints at the crime scene.

Police interviewed King twice, but he did not admit guilt. During the first interview, King stated that he bought the pawned bracelet for $50 from a guy known as "Budha," who hung out in his neighborhood. King was going to give the bracelet to his girlfriend, but he needed cash to catch up on bills. King denied having a Cadillac or lending the keys to anyone. He stated that he had worked with Roman on mowing Renie's yard, but he did not really speak to her and had never been inside her house.

When questioned about the items found in his apartment, King stated that he found them in a vacant apartment near his apartment, took them home, and put them in his closet. He did not know to whom the items belonged. King stated that he looked in the vacant apartment because his apartment had been broken into and burglars were known to stash items in the nearby vacant apartment complexes. He stated that he found his stolen property in the vacant apartment as well. He had filed a police report on December 3, 2009, regarding a burglary of his home.

Police took a sample of King's DNA. The DNA on the melon at Renie's home was found to match that of King. The DNA on the fruit would match only 1 in 440 trillion Caucasians, 1 in 770 trillion African–Americans, and 1 in 280 trillion southeastern Hispanics.

After the DNA on the melon in Renie's house was identified as matching King's DNA, the police questioned him a second time on February 5, 2010. King again stated that he had never been inside Renie's house and never took money from her; she always paid Roman for the lawn care services. He then subsequently stated upon further questioning that he had previously been inside Renie's living room when he had stepped inside her house to speak to her, which was contrary to his earlier statements. When King was shown a picture of the fruit from the crime scene, he stated that Renie had previously given fruit to him and Roman. When asked why his DNA was found on the fruit, King stated that the victim served them fruit when they were previously at her house.

The jury convicted King of first-degree murder (both premeditated and felony murder), burglary, grand theft of an

automobile, dealing in stolen property, and false verification of ownership on a pawn broker transaction form.

**The Penalty Phase**

During the penalty phase, the State presented victim impact testimony from Renie's family and friends. King presented mitigation testimony from family members and friends, who testified that he was an articulate, intelligent, and caring individual. His parents divorced when he was young, after which he and his mother moved to Orlando. He was very close with his mother, who died of breast cancer. King took care of his mother in her final days, and her death impacted him greatly. He cared for his grandmother when she had Alzheimer's disease, including bathing her, clothing her, and feeding her. When his aunt broke her hip in 2009, he visited and consoled her. King has a three-year-old son, with whom he is very close and has a good relationship. King went to church when he lived with his mother in Orlando and considered seminary at one point. According to one family member, King would have made a good minister. His family members would visit him if he was sentenced to life in prison.

The jury recommended death by a vote of eight to four. Subsequently, the trial court held a *Spencer* [*v. State*, 615 So. 2d 688 (Fla. 1993),] hearing, at which King presented two witnesses. The first witness was his former girlfriend, who testified that he was a nice, articulate, funny, and smart individual; that he had a very good relationship with his mom prior to her death; and that it was very hard for him when she passed away. The second witness was a correctional officer who testified that in the year that King had been on his block in prison, the officer did not have any trouble with King.

The trial court followed the jury's recommendation and sentenced King to death. The trial court found the following aggravating circumstances: (1) the capital felony was committed while the defendant was engaged in the commission of a burglary and for the purpose of pecuniary gain (merged); and (2) the capital felony was especially heinous, atrocious, or cruel (HAC). The trial court gave both aggravating circumstances great weight. The trial court found no statutory mitigating factors, but found numerous nonstatutory mitigating factors. The trial court found that two mitigating factors were not established: (1) the incident at issue was situational; and (2) the defendant had a lack or deficiency of positive role models.

*King v. State*, 130 So. 3d 676, 679-83 (Fla. 2013), *cert. denied*, 571 U.S. 1218

(2014).

On direct appeal, King raised five issues, all of which related only to the

penalty phase: (1) the trial court erred in instructing the jury on and in finding the

HAC aggravating factor; (2) his sentence of death is disproportionate; (3) the trial

court erred in allowing the prosecutor to make improper closing arguments about

an avoid-arrest aggravating factor, which was not submitted to the jury or found by

the trial court; (4) the trial court erred in prohibiting defense counsel from making

the proper argument that King had no history of violent crime; and (5) his death

sentence is unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002). *King*,

130 So. 3d at 683. This Court denied relief as to each claim and additionally

determined that there was sufficient evidence to support King's first-degree murder

conviction, and King's sentence of death was proportionate. *Id.* at 683-90. King's

convictions became final in 2014. *King*, 571 U.S. 1218.

King filed a timely motion to vacate his first-degree murder conviction and

sentence of death pursuant to rule 3.851, raising eight claims for relief:

(1) ineffective assistance of counsel during jury selection; (2) ineffective assistance

of counsel during the guilt phase; (3) a *Brady*[1] violation; (4) ineffective assistance

of counsel during the penalty phase; (5) the imposition of the death penalty by

---

1. *Brady v. Maryland*, 373 U.S. 83 (1963).

lethal injection is unconstitutional; (6) cumulative error; (7) newly discovered evidence based on *Hurst v. Florida*, 136 S. Ct. 616 (2016); and (8) ineffective assistance of counsel for failing to object at numerous instances during the guilt phase. After reviewing the pleadings and hearing argument from counsel, the postconviction court granted an evidentiary hearing on claims 1-4. The evidentiary hearing took place in multiple segments: February 16, 2016, through February 19, 2016; November 3, 2016; and February 1, 2017.

At the evidentiary hearing, King's attorneys, Refik Eler and Quentin Till, were called to testify. Till was the first-chair attorney and primarily managed the guilt phase while Eler managed the penalty phase. Both Till and Eler were highly experienced lawyers with lengthy careers—Till for forty-six years and Eler for thirty. Till and Eler were assisted on King's case by junior attorneys, Deb Billard and Shawn Arnold, and mitigation specialists, Holly Ayers and David Douglas. The team frequently met and would inform King of their recommendations.

Eler testified that the team was aware that King had confessed that he knew the victim, had been in the victim's home, and had eaten fruit the victim provided to him. Eler explained that, when considering calling experts to try to implicate a guilty third-party or making other decisions, the team made informed decisions based on what they knew in the case and whether it fit with their defense theory.

After the evidentiary hearing, the postconviction court issued an order denying King's guilt phase claims, vacating King's sentence of death, and granting a new penalty phase pursuant to *Hurst*. Because the postconviction court granted King *Hurst* relief, it did not address King's other penalty phase claims. As we discuss below, we affirm the postconviction court's order in full.

## ANALYSIS

King claims ineffective assistance of trial counsel in the guilt phase for twelve reasons: (1) failure to adequately redact statements in King's interrogation video; (2) failure to object to Detective Cayenne's improper hearsay testimony at trial; (3) failure to object to the introduction of and repeated references to a bloody shirt found in King's residence; (4) failure to investigate and present expert witnesses at trial; (5) failure to present a DNA expert at trial; (6) failure to obtain a shoe impression expert; (7) failure to obtain a latent fingerprint expert; (8) failure to object to Detective Cayenne's cellphone testimony and failure to present a cellphone expert to rebut that testimony; (9) failure to object to the leading questioning of witness Rashad Montfort; (10) failure to object to the leading questioning of witness Detective Cayenne; (11) failure to object to various arguments in the State's closing argument; and (12) cumulative error. After discussing the standard of review, we address each claim in turn, concluding that

none of King's claims of ineffective assistance of counsel have merit because either deficiency or prejudice or both has not been established.

## Standard of Review

Following the United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), this Court has explained that a defendant must satisfy two requirements to receive relief on an ineffective assistance of counsel claim:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

*Schoenwetter v. State*, 46 So. 3d 535, 546 (Fla. 2010) (quoting *Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986)).

First, to establish the deficiency prong under *Strickland*, the defendant must prove that counsel's performance was unreasonable under "prevailing professional norms." *Morris v. State*, 931 So. 2d 821, 828 (Fla. 2006) (quoting *Strickland*, 466 U.S. at 688). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

Second, as to the prejudice prong of the *Strickland* test, this Court has explained:

> "*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." *Wong v. Belmontes*, 558 U.S. 15 (2009) (quoting *Strickland*, 466 U.S. at 694). *Strickland* does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " *Porter v. McCollum*, 558 U.S. 30 (2009) (quoting *Strickland*, 466 U.S. at 693-94). This Court employs a mixed standard of review, deferring to the postconviction court's factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo.

*Mosley v. State*, 209 So. 3d 1248, 1264 (Fla. 2016) (quoting *Smith v. State*, 126 So. 3d 1038, 1042-43 (Fla. 2013)).

"[U]nder *Strickland*, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's *factual* findings." *Eaglin v. State*, 176 So. 3d 900, 906 (Fla. 2015) (quoting *Stephens v. State*, 748 So. 2d 1028, 1033 (Fla. 1999)). We now turn to address King's claims of ineffective assistance of trial counsel, Quentin Till and Refik Eler.[2]

---

2. Till was the first-chair attorney and primarily managed the guilt phase of King's trial, while Eler managed the penalty phase. *See* Order on Def.'s Third Am. Mot. to Vacate J. & Sentence Under Rule 3.851 with Special Req. for Leave to Am. & Def.'s Suppl. to his Sixth Am. Mot. to Vacate Js. of Conviction & Sentence, *State v. King*, No. 16-2010-CF-01450-AXXX-MA (Fla. 4th Jud. Cir. July 12, 2017), 8-9 [hereinafter Order].

## King's Claims of Ineffective Assistance of Counsel

### 1. Failure to Object to Statements in King's Interrogation Video

King contends that the postconviction court erred in denying his claim for ineffective assistance of counsel relating to Till's failure to object to the introduction of many of the detective's statements during King's interrogations that were then admitted in evidence. King asserts that because the statements were made by law enforcement officers, they likely carried undue weight, resulting in prejudice.

King categorized Detective Cayenne's statements as follows: (1) improper bolstering; (2) improper comment on King's truthfulness, credibility, and guilt; (3) improper opinion; (4) improper comments on King being in jail and the amount of his bond; (5) improper comments on remorse; (6) improper characterization and name calling; and (7) shifting the burden of proof. The postconviction court denied King's claim, stating:

> Initially, the Court notes that prior to trial, counsel filed "Defendant's Objections to his Audio and Videotaped Statements," in which counsel objects to a number of the statements Defendant now contends should have been redacted. In that Motion, counsel averred many statements made in the video, including various statements now being contested, should be excluded for a variety of reasons, including: (1) the statements were irrelevant and prejudicial under sections 90.401, 90.402, and 90.403, Florida Statutes; (2) the statements were comments on Defendant's character; (3) the statements were inadmissible as "expression[s] of the Jacksonville Sheriff's Office detective's belief that [Defendant] is guilty or that [Defendant] is lying; (4) the statements "are being used solely to

- 12 -

bolster the Jacksonville Sheriff's Office detective's credibility; and (5) "[t]he statements are expressions of Jacksonville Sheriff's Office detective's theories on what he believes happened and his speculation. To the extent counsel objected to the statements now being contested, counsel cannot be deemed ineffective as he attempted to have these statements excluded.

Till testified that he recalled filing the motion to obtain redactions, but noted that what played during trial was the result of the judge's rulings. Till testified he was familiar with the case law on this issue . . . and tried to raise such issues in his motion. Till recounted spending 100 hours on redaction of the interrogation, speaking to the State regarding the redactions, and getting a large amount of the interrogation redacted. Defense counsel stated that he did not object to the playing of the videos at trial because he and the State had already negotiated what would be presented based on their views of what presentation would be fair.

. . . .

In this case, the detectives' tactics elicited admissions from Defendant regarding pawning the victim's jewelry, having been in her home, being in possession of luggage which contained her property, and his cousin having driven the victim's car. Moreover, many of the statements regarding the veracity of Defendant's comments were in response to his contradictory answers and answers which contradicted the evidence. Additionally, the Court finds these statements were of the type that would be understood by a rational jury to be techniques being used by the detectives.

Order at 19-21 (citations omitted).

Applying the first prong of the *Strickland* test to this claim, we conclude King's trial counsel was not deficient. King argues that Till "never thought to object" at trial because Till had already spent significant time redacting the tape of the recording. Initial Br. of Appellant, at 23. However, the record and Till's testimony at the postconviction evidentiary hearing indicate that, in fact, he did object to several of the statements that King now challenges. At the postconviction

- 13 -

evidentiary hearing, Till testified that he worked extensively on redacting the video, was thoroughly aware of the case law on this issue, and did his best to redact everything he thought was improper. He testified that he "probably spent a hundred hours" on the redaction, the amended redaction, and reviewing it with his staff.

This Court has recognized that a jury may hear an interrogating detective's remarks about a crime when they provoke a relevant response from the defendant. *McMillian v. State*, 214 So. 3d 1274, 1286 (Fla. 2017); *Jackson v. State*, 18 So. 3d 1016, 1032 (Fla. 2009). King relies on *Martinez v. State*, 761 So. 2d 1074 (Fla. 2000), where a detective was called to testify as to his investigation of the murder of Douglas Lawson. *Id.* at 1078-79. There, the prosecutor asked the detective: "Was there any doubt in your mind based on what [the defendant] said then that he was responsible for the murder of Douglas Lawson?" *Id.* at 1079. The detective answered: "There was no doubt that he did it." *Id.* The prosecution then highlighted this opinion testimony during closing argument, stating that the defendant "*was arrested because nobody had a doubt that he was guilty.*" *Id.*

However, the facts of *Martinez* are very different from King's case. In *Martinez*, this Court determined that the detective's testimony was improper because "a witness's opinion as to the guilt or innocence of the accused is not admissible." *Id.* In this case, the detectives' statements were not made as

- 14 -

testimony regarding King's guilt but, rather, as part of their interrogation of King. As this Court has held in other cases, it was not improper for the jury to hear statements that elicited a reaction from King during the interrogations, especially because they gave proper context to the entirety of the interrogation, which elicited several incriminating and inconsistent statements by King. *McMillian*, 214 So. 3d at 1286-87 (citing *McWatters v. State*, 36 So. 3d 613, 638 (Fla. 2010)). Thus, counsel was not deficient in failing to make additional objections at trial after he had worked extensively with the prosecution to have other objectionable portions redacted.

Further, King fails to show that he was prejudiced by Till's failure to object at trial. This case is similar to *McMillian*, where this Court found that defense counsel's failure to redact statements made by law enforcement during a recorded interview did not prejudice the defendant and did not amount to ineffective assistance of counsel. *Id.* at 1287. "When placed in 'their proper context,' an interrogating detective's statements to a suspect could be understood by a rational jury to be 'techniques' used by law enforcement officers to secure confessions." *Id.* at 1286 (quoting *McWatters*, 36 So. 3d at 638 (quoting *Worden v. State*, 603 So. 2d 581, 583 (Fla. 2d DCA 1992))).

In addition, the evidence against King was compelling. King was in possession of numerous pieces of the victim's property, pawned her jewelry, and

his DNA was found on cantaloupe located on the victim's kitchen table.  Thus, even if the detectives' statements were not included in the interrogation video, we agree with the postconviction court that confidence in the outcome of the trial is not undermined.  Because King fails to meet either prong of *Strickland*, we affirm the postconviction court's order denying this claim.  *Mosley*, 209 So. 3d at 1264.

Accordingly, King is not entitled to relief on this claim.

### 2. Failure to Object to Detective Cayenne's Improper Hearsay Trial Testimony

Next, King contends that the postconviction court erred in finding that Till's failure to object to Detective Cayenne's improper hearsay trial testimony did not constitute ineffective assistance of counsel for failure to establish either deficiency or prejudice.  The postconviction court denied King's claim, explaining:

> First, the Court finds that many of the comments Defendant points to as being hearsay when testified to by Detective Cayenne were actually testified to by the original declarants.  Thus, Defendant cannot establish he was prejudiced by counsel's failure to object to Detective Cayenne's testimony.  For instance, while Detective Cayenne testified that he spoke with the victim's daughter, Lyza Telzer ("Telzer"), and through that conversation, learned the victim was "very meticulous and very neat," Telzer also stated the same at trial.  Telzer also testified about the property stolen from the victim's home, including jewelry and a television.  Indeed, Telzer testified that after being shown photographs, she had gone to a pawn shop and identified a gold bracelet that belonged to the victim.  The victim's neighbor, Richard Broxton, testified about finding the victim's garage door open on the day her body was discovered.
> Montfort testified that he obtained the Cadillac and the car keys from Defendant, that Defendant told him the vehicle was located around the corner from his apartment, and that Defendant instructed

- 16 -

him where to park the Cadillac when Montfort returned it. Montfort also testified about calling Defendant while he had the Cadillac. Montfort stated that while driving the car, his friend "Monk Man" joined him in the car, and they went to see Montfort's cousin, Robert Epps ("Epps"), while in the car.

Defendant's former employer, James Roman ("Roman"), testified that Defendant had worked for him for approximately four months doing lawn maintenance, which included work at the victim's home. Around Christmas, Roman was in West Virginia when he received a call from Defendant asking whether Roman had seen the news story about one of his customers. Roman also testified that Defendant wore a straw hat while working. Roman told the jury that Defendant often took the bus to the Town and Country station to meet Roman for work. FDLE analyst Jason Hitt testified that the DNA swab from the fruit recovered from the victim's kitchen table resulted in a male profile that matched Defendant's cheek swabs.

Thus, fifteen of the twenty-nine statements at issue were corroborated by the original declarants of the statements. Moreover, as to Detective Cayenne's comment that his partner observed a shoeprint on the door that was larger than the size of the victim's, that information was also provided by the crime scene investigator who testified that there was a partial shoeprint on the door that measured 11.61 inches, so the shoe size would have had to be even larger. Additionally, as noted by Defendant in a footnote, counsel did object to comments made by Detective Cayenne as shifting the burden onto Defendant, counsel simply did not object based on hearsay as well.

Three of Detective Cayenne's remaining alleged hearsay statements were actually beneficial to Defendant's case: his testimony that he spoke with Defendant's apartment complex residents and none could say who drove the Cadillac; his testimony that the fingerprints located within the Cadillac matched Epps and Montfort; and his testimony that the bus driver with whom Detective Cayenne spoke could not identify the individuals that the bus picked up. Other statements, like Cayenne's statement that Jordan, Myles Telzer's friend, did not eat anything at the victim's house would not likely harm Defendant's case. Trial counsel was not deficient for failing to object to testimony which was favorable to Defendant and Defendant cannot demonstrate, in any manner, that these beneficial or immaterial statements prejudiced him.

Additionally, some of Detective Cayenne's statements simply do not constitute hearsay. For instance, Detective Cayenne's testimony that Hitt suggested that getting Defendant's DNA from cheek swabs would be better than trying to obtain his DNA from the straw hat he wore at work was not presented for the truth of the matter asserted. § 90.801, Fla. Stat. (defining hearsay as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."). Lastly, Detective Cayenne's statement regarding Defendant's phone call does not constitute hearsay.

As for the remaining statements, counsel is not ineffective for making a tactical decision not to object. Indeed, Till testified that if a hearsay statement was not going to harm Defendant's case, he may not object. Eler also stated that there is strategy in not objecting to certain things because they will inevitably come in anyway or it is a minor issue that would not affect the trial. Not only was counsel reasonable in his actions, but Defendant has failed to show how he was prejudiced by counsel's failure to object.

Order at 24-27 (citations omitted).

When the court determines that counsel's decision not to object was a result of "trial tactics," counsel is not deficient for failing to object to "very minor hearsay matters." *Hall v. State*, 212 So. 3d 1001, 1024 (Fla. 2017) (citing *Brown v. State*, 846 So. 2d 1114, 1122 (Fla. 2003)).

King points to instances in Detective Cayenne's testimony that he believes should have elicited an objection from counsel. First, some of Detective Cayenne's statements that King challenges were not even hearsay. For example, Detective Cayenne testifying to the content of Montfort's cell phone records does not constitute improper hearsay evidence. As recognized by this Court, phone company call lists are not out-of-court statements by a declarant. *Wade v. State*,

- 18 -

156 So. 3d 1004, 1024-25 (Fla. 2014) (concluding that "counsel did not err by not raising a hearsay objection to the [marshal's] testimony about the content of the [phone] records" because "phone company call lists are not out-of-court statements by a declarant").  Likewise, Detective Cayenne testified that DNA expert Jason Hitt suggested that it would be better to gather DNA from cheek swabs rather than a straw hat.  This statement was not offered for the truth of the matter asserted.  *See* § 90.801(1)(c), Fla. Stat. (2018).  Again, counsel cannot be ineffective for failing to raise a meritless objection.  *Peterson v. State*, 154 So. 3d 275, 280 (Fla. 2014).

Further, to the extent the other statements did, in fact, constitute improper hearsay evidence, King cannot establish prejudice because they all relate to very minor aspects of the trial, and most of the statements were corroborated by other witnesses.  In fact, as the postconviction court explained, "fifteen of the twenty-nine statements at issue were corroborated by the original declarants of the statements."  Order at 25.  For instance, King argues that counsel should have objected when Detective Cayenne testified that he spoke with the victim's daughter, Lyza Telzer, and learned that the victim was "very meticulous and very neat"; but Telzer said the same at trial.  Further, the victim's neighbor, Richard Broxton, also testified about finding the victim's garage door open on the day her body was discovered.

- 19 -

In addition, Till testified at the postconviction evidentiary hearing that if a hearsay statement was not going to harm King's case, he did not object. Again, counsel is not ineffective for making a tactical decision to not object. *See Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."). It was within Till's discretion to develop his own trial strategy and not object to minor hearsay matters. Thus, King is similarly unable to show prejudice rising to the level required under *Strickland* to merit relief.

Accordingly, King is not entitled to relief on this claim.

### 3. Failure to Object to the Introduction of and Repeated References to a Bloody Shirt Found in King's Residence

Next, King contends that the postconviction court erred in determining that Till's failure to object to a bloody shirt found in King's residence did not result in ineffective assistance of counsel for failure to establish either deficiency or prejudice. During the trial, both parties mentioned a bloody shirt that was found in King's house. Till testified that the bloody shirt could not be matched to the victim or King, and he used the shirt to argue in closing that the police were careless with their investigation. Till, who handled the cross-examination of Detective Cayenne, testified that the "bloody shirt was a smoke screen. It had nothing to do with this case." He further testified that he did not know

why it got blown out . . . of proportion. It was a . . . shirt that Cecil King was surprised in the interrogation tape and—and was not Cecil King's blood type, it was not [the victim's] blood type. It was just like a red herring or something just thrown in there.

The postconviction court denied King relief, stating in part:

> At trial, the discussion of the bloody shirt was minimal when placed in the context of a four-day trial. The subject did not become a feature of the trial. Rather, while the shirt was discussed during Defendant's interrogation, through the testimony of Detective Cayenne and Florida Department of Law Enforcement DNA expert, Jason Hitt ("Hitt"), the majority of statements involving the bloody shirt were to inform the jury that the blood on the shirt was not Defendant's, the victim's, or Myles Telzer. Indeed, Detective Cayenne informed the jury that the shirt had no relation to the case. Many of the remaining references were from defense counsel to point out the lack of police work in regards to this shirt; specifically, that the shirt was not even Defendant's size, the police did not test the hairs found on the shirt, and the police did not compare the DNA from the shirt to that of the individuals whose prints were found in the victim's car.
>
> Moreover, the State did not mention the bloody shirt during opening or closing arguments. Rather, the only mention of the shirt in closing arguments was by defense counsel. Till's closing argument focused on sloppy police work and detectives who were just reaching for a suspect. Till used the subject of the bloody shirt to cast doubt on the police work completed in this case. During closing, Till argued that Detectives Romano and Cayenne had "badgered" Defendant until they convinced Defendant it was his bloody shirt only to have DNA evidence later prove that the blood on the shirt was not Defendant's or the victim's. Till tied this information together with testimony stating hairs found on the shirt were never tested. Till reasoned that if the detectives could obtain a false confession from Defendant about the bloody shirt being his, they could obtain a false confession concerning his presence in the victim's home.

Order at 22-23 (citations omitted).

Unlike in *Beasley v. State*, 18 So. 3d 473 (Fla. 2009), where a bloody shirt served as crucial evidence in the State's prosecution, King used the bloody shirt found in his home as part of his own argument that the police ran a careless investigation. The State never mentioned the shirt during its opening statement or closing argument. Contrary to King's argument that Till did not have a "strategic" or "tactical" reason for how he dealt with the shirt, the record indicates that Till's strategy focused on arguing, without experts, that the State was relying on the faulty investigatory work of the police.

Even if Till's decision appears to have been unwise in retrospect, strategic decisions are generally insulated from *Strickland*. *See Occhicone*, 768 So. 2d at 1048. The postconviction court determined that Till's strategy to use the shirt in his defense was a reasonable trial strategy.

Further, regardless of whether the bloody shirt should have been admitted into evidence at trial, King cannot establish prejudice. It is undisputed that the blood on the shirt did not match King's DNA. As the postconviction court explained, while the shirt was discussed during King's interrogation, the majority of statements admitted involving the bloody shirt were to inform the jury that the blood on the shirt was not King's, the victim's, or Telzer's son's. Order at 22. Additionally, the jury was informed that the shirt had no relation to the case. Many of the remaining references were made by defense counsel in noting the poor

- 22 -

police work related to this shirt. Specifically, the shirt was not even King's size; the police did not test the hairs found on the shirt; and the police did not compare the DNA from the shirt to that of the individuals whose prints were found in the victim's car. *Id.*

DNA evidence was presented ruling out King and the victim as possible contributors for the blood found on the shirt. Moreover, as explained above, Till was able to use the evidence to support the defense theory of the lack of police investigation in this case. At worst, the admission of the shirt did not affect King's defense; at best, the shirt was actually helpful to the defense's case. Thus, the postconviction court did not err in concluding that, even if King's counsel was deficient for failing to object to the introduction of the evidence, confidence in the outcome of the trial is not undermined.

Accordingly, King is not entitled to relief on this claim.

### 4. Failure to Investigate and Present Expert Witnesses at King's Trial

Next, King claims that trial counsel's failure to present or retain expert witnesses at trial constituted ineffective assistance of counsel.

This Court has explained that counsel does not necessarily perform deficiently by failing to retain an expert witness to rebut the State's expert testimony at trial. *See Crain v. State*, 78 So. 3d 1025, 1041 (Fla. 2011); *Belcher v. State*, 961 So. 2d 239, 250-51 (Fla. 2007). Accordingly, King is not entitled to

relief on this general claim. We now turn to address King's claims regarding specific experts that should have been retained: a DNA expert, a shoe impression expert, and a latent fingerprint expert.

### 5. Failure to Present a DNA Expert

Next, King argues that the postconviction court erred in concluding that trial counsel's failure to present a DNA expert to rebut the State's expert witness did not result in ineffective assistance of counsel for failure to establish either deficiency or prejudice. The postconviction court denied King's claim, stating:

> In his recorded interview, Defendant admitted to previously being in the victim's home and having the victim serve him fruit. Additionally, trial counsel cross-examined Hitt about the acids in the cantaloupe and how they could have affected the DNA results. Through cross examination, counsel was able to get Hitt to concede that it was possible that the citric acid in the cantaloupe could have degraded the DNA sample. Defense counsel noted this point during his closing argument. Moreover, counsel elicited testimony that this fruit, despite being out on the counter, was not discovered until many hours after the victim was found and police had been on the scene. Counsel further elicited testimony that the cantaloupe was destroyed after the State obtained its swab, but prior to Defendant being able to gather his own evidence. Defense counsel again emphasized this issue during his closing argument, as it supported the defense of faulty police work that counsel presented throughout trial.
>
> Till and Eler both testified that they consulted a DNA expert, Bruce Budowle. Each attorney testified that the expert told him it was probably better not to retest and not to have two people testifying regarding Defendant's DNA. Eler further testified that in motioning the Court to test items for DNA, they could have tipped off the State to test an item further. Till and Eler both stated that the defense team made the strategic decision to bring out the weaknesses in the DNA evidence for this case and what might have been discovered if fruit had not been destroyed, rather than presenting a defense DNA expert.

> The Court finds this was a reasonable strategic decision and that it was reasonable to limit his investigation into further DNA, especially in light of the fact that counsel had heard Defendant confessed to an investigator for the defense.
>
> Further, as to the allegation that counsel should have hired a DNA expert to test the untested hair, fiber, and blood on the bloody shirt found in Defendant's closet, the Court finds the shirt does not have a sufficient nexus in the crime to warrant such an expert. The blood on the shirt did not match the DNA of Defendant or the victim. Even if the hair, fiber or blood matched someone else's DNA, there would be no connection to this case. If the hair or fiber came back as matching the victim, however, such evidence would have harmed King's case as the shirt was found in his closet.

Order at 29-30 (citations omitted) (footnotes omitted).

At the postconviction evidentiary hearing, King's trial counsel testified that, prior to trial, he consulted with a DNA expert, Dr. Bruce Budowle, who indicated that his testimony would not provide much assistance to the defense's case. Dr. Budowle also indicated that retesting the DNA would likely confirm the results reached by the Florida Department of Law Enforcement (FDLE). Further, Till testified that Dr. Budowle advised Till that performing additional DNA testing could be problematic. In light of King's admission that he was in the victim's home prior to the murder, Eler testified that they decided to not risk creating additional evidence that would be damaging to the defense's case.

At the postconviction evidentiary hearing, King called Dr. Kevin Noppinger as a postconviction DNA expert. Dr. Noppinger testified that he disagreed with some of FDLE's findings and procedures, noting that the cantaloupe could have

been frozen to preserve it for further testing. He also determined that a partial DNA profile retrieved from the victim's socks excluded the victim and King as contributors. However, FDLE had determined that the swab did not contain enough DNA to create a profile, and they could not compare it to DNA standards.

Considering all of this information, it is clear that King's trial counsel made a reasonable strategic decision to not call a DNA expert to rebut the State's DNA testimony at trial. King's trial counsel made this decision after considering alternatives and determined that calling another DNA expert to perform further forensic testing could potentially reveal more evidence against King. Therefore, trial counsel's decision was reasonable under the norms of professional conduct. *See Occhicone*, 768 So. 2d at 1048.

In *Taylor v. State*, 62 So. 3d 1101 (Fla. 2011), Taylor asserted that his trial counsel was deficient for failing to raise specific objections regarding DNA evidence and the State's expert's testimony. *Id.* at 1111. This Court determined that Taylor's counsel's failure to make specific objections was the product of an overall strategy and therefore did not amount to deficient performance. *Id.*

Similar to *Taylor*, King's trial counsel did not present a DNA expert at trial, but did testify about having multiple conversations with an expert about the case and determined that vigorous cross-examination of the State's expert would be an effective strategy. King's trial counsel cross-examined the State's DNA expert,

Hitt, and was able to exploit various weaknesses in the State's case, including the possibility of cross-contamination of items found in the victim's home and the existence of an incomplete DNA profile. This does not amount to deficient performance under *Strickland*, considering that King's trial counsel was able to effectively cross-examine Hitt as part of the defense's overall strategy to emphasize the weaknesses of the State's DNA evidence and that the DNA match to King was incomplete. As this Court has previously stated, a defendant cannot establish deficient performance for failure to retain a DNA expert when trial counsel decides that doing so would be a disservice to his client. *Carroll v. State*, 815 So. 2d 601, 613 (Fla. 2002).

Even assuming that trial counsel was deficient for failing to retain a DNA expert, King cannot demonstrate prejudice under *Strickland*. In his recorded interview, King admitted to previously being in the victim's home and having the victim serve him fruit. King's trial counsel used this fact in his argument and also emphasized the fact that the cantaloupe was destroyed after the State obtained its DNA swab, which supported the defense's theory of faulty police work. Finally, Dr. Noppinger did not identify any evidence that should have been presented at trial and agreed with all but one of the FDLE's findings on the DNA, other than one immaterial discrepancy.

Because King is unable to prove that his trial counsel's performance was deficient and cannot establish that his defense was prejudiced by deficient performance, King's claim fails under *Strickland*. *Mosley*, 209 So. 3d at 1264. Accordingly, King is not entitled to relief on this claim.

### 6. Failure to Obtain a Shoe Impression Expert

Next, King argues that the postconviction court erred in concluding that trial counsel's failure to present a shoe impression expert and rebut the State's shoe impression expert did not result in ineffective assistance of counsel for failure to establish either deficiency or prejudice. For the following reasons, we conclude that King's claim fails.

The postconviction court denied King's claim, stating:

> The jury heard that the shoe impressions located outside the victim's home were never matched to any shoes recovered from Defendant. Till used this issue during cross-examination and closing argument to cast doubt on the State's case. Specifically, Till argued that the investigator was not qualified to determine the shoe size, and that although such an expert was available to the State, the State did not use that resource.
> Additionally, Till testified at the evidentiary hearing that he did not feel such an expert was warranted because the shoeprint lacked connection to the case in that the print was not a match to any of Defendant's shoes. Moreover, Till mentioned that he was worried that any additional evidence on the issue may have opened the door to other damaging testimony for Defendant. Specifically, Till mentioned concern that the State would then be able to elicit testimony regarding a footprint analysis for the burglary next door to the victim's house and testimony that Defendant had also pawned some of the victim's neighbor's property after evidence of that crime had been excluded from the trial.

Order at 32-33 (citations omitted).

As the postconviction court's order states, King's trial counsel decided not to hire a shoeprint expert. Till testified that he did not feel the need to call a shoeprint expert because the shoeprints at the scene did not match any of King's shoes. Till noted that law enforcement found numerous shoeprints but were unable to match even one of them to King. He was also aware that King was implicated in a robbery at a nearby home in the victim's neighborhood the month before the murder. Thus, Till was concerned about opening the door for that evidence to be brought out as rebuttal evidence if the defense presented a shoeprint expert.

At the postconviction evidentiary hearing, King called William Bodziak, who provided expert testimony on forensic shoeprint evidence. While Bodziak criticized the police investigation for determining the size of the prints based on photographs, he noted that "the most common way to collect this evidence would be photography." Specifically, Bodziak said the best way to determine the size of the shoeprints and make a two-dimensional impression is to seize the door that had the prints. After reviewing the evidence in the case, he concluded that determining the size of the print would be impossible because of the multiple shoe impressions on the door and the inaccuracy of the scale, even if he had samples of the full range of sizes for the shoe that was used. Bodziak also noted that the shoeprints found in

the dirt around the victim's home appeared to be similar to the prints on the door, but were "partial impressions" and yielded inconclusive results.

Finally, evidence was presented to the jury during trial that the shoe impressions located outside the victim's home were never matched to any shoes recovered from King. Similarly, in *Happ v. State*, 922 So. 2d 182 (Fla. 2005), this Court affirmed the postconviction court's denial of Happ's claim that counsel was ineffective for failing to present a shoe expert where counsel did not believe he needed an expert to rebut the State's evidence. *Id.* at 195. Ultimately, the Court affirmed the postconviction court's denial of the claim because the State "could not state that [the defendant's] shoe made the shoeprint or that it was even a strong match." *Id.* Thus, in this case, counsel's decision was a reasonable strategic decision and cannot be deemed deficient, nor can King establish prejudice.

Accordingly, King is not entitled to relief on this claim.

### 7. Failure to Obtain a Latent Fingerprint Expert

Next, King argues that the postconviction court erred in concluding that trial counsel's failure to obtain a latent print expert and rebut the State's latent print expert testimony did not result in ineffective assistance of counsel for failure to establish either deficiency or prejudice. King argues that he was prejudiced by

counsel's decision to not obtain a print expert because the expert could have

rebutted the State's evidence against him to change the outcome of the trial. [3]

The postconviction court denied King's claim, explaining:

> At trial, testimony revealed that the fingerprints located in the victim's Cadillac matched Epps and Montfort. None of the prints recovered from the vehicle or the victim's house matched Defendant. The only print found to have matched Defendant was on the pawn slip for the bracelet. However, Defendant fully admitted to pawning the bracelet in his interrogation. Because there was no testimony indicating fingerprints recovered from the Cadillac or the victim's home matched Defendant's fingerprints, it was unnecessary to present the testimony of an expert on the subject as there was no testimony or evidence presented by the State for the defense to rebut.
> Again, counsel adequately cross-examined the State's witness and obtained testimony favorable to Defendant's case; specifically, that Defendant's fingerprints were found nowhere in the victim's house or car. Indeed, counsel reiterated this point in his closing argument. Moreover, the postconviction expert's testimony presented at the evidentiary hearing does not support relief in this case. Brown testified that he agreed with the findings of the print examiner in this case as to all but one print and Brown excluded Montfort and Epps as a match to that print. The expert could not definitively state that the print was not a match to the victim or Defendant. For the reasons

---

3. While King's underlying motion for postconviction relief was pending, he also filed a motion for postconviction DNA testing pursuant to Florida Rule of Criminal Procedure 3.853 and a motion for postconviction latent fingerprint testing. The postconviction court granted in part and denied in part King's rule 3.853 motion for postconviction DNA testing or running any existing profiles through CODIS or both. Upon review, this Court affirmed the postconviction court's "thorough and well-reasoned order" regarding King's rule 3.853 motion. *King v. State*, Nos. SC16-1263 & SC16-1268, 2017 WL 727752, at *1 (Fla. Feb. 24, 2017). We denied King's petition for review of the postconviction court's order denying his motion for latent fingerprint testing because King "failed to show why the order departs from the essential requirements of law" and how there would be no adequate remedy on appeal. *Id.* King does not raise any issue regarding his motion for latent fingerprint testing or DNA testing in this appeal.

stated above, the Court finds that counsel did not act deficiently in failing to present a defense latent fingerprint expert. Likewise, the Court finds Defendant has failed to meet his burden of showing that the testimony of an expert would have likely changed the outcome of the proceeding. Defendant is, accordingly, not entitled to relief.

Order at 34-35 (citations omitted).

King argues that had trial counsel retained a latent print expert, he could have proven to the jury that the Ziploc container lid found on the counter of the east wall in the victim's kitchen was of evidentiary value and contained prints from someone other than King. At the evidentiary hearing, King called a latent print expert, Elzner Brown, who agreed "with the results of eleven of twelve fingerprint lifts from the victim's home." *Id.* at 34. As to the one print about which Brown disagreed—referred to as No. 6—Brown found the print to be of comparison value. *Id.* Brown did not match No. 6 to King, Epps, or Montfort, but said it could have belonged to anyone. *Id.* Therefore, Brown's disagreement with the Jacksonville Sherriff's Office's determination that No. 6 had "no value" was meaningless. *See id.* at 34. Calling an expert to testify would not have produced any favorable evidence that would have had a reasonable probability of changing the outcome of King's trial.

In addition, similar to the DNA evidence, reprocessing the Ziploc container risked creating additional incriminating evidence. As with the shoeprint expert, Till mentioned that he was concerned about opening the door for evidence of King

being implicated in a robbery at the victim's neighbor's home being presented as rebuttal evidence. This shows that Till considered alternative possibilities before deciding to not hire a latent print expert for King's case, and his strategic decision was reasonable under the norms of professional conduct. *See Occhicone*, 768 So. 2d at 1048.

Similarly, in *Buzia v. State*, 82 So. 3d 784 (Fla. 2011), the defendant argued that had trial counsel hired an independent latent print expert to examine a bloody palm print, the expert would have testified that the print did not match the defendant's and the jury would have arrived at a different conclusion. *Id.* at 797. This Court decided that the defendant could not be excluded as the person who made the print because it was insufficient to match it to anyone. *Id.* Because there was ample evidence that the defendant had committed the crime, there was no reasonable basis for questioning whose palm print was found on a cabinet in the victims' home. *Id.*

Accordingly, King is not entitled to relief on this claim.

### 8. Failure to Object to Detective Cayenne's Cell Phone Testimony and Failure to Present a Cell Phone Testimony Expert

Next, King argues that the postconviction court erred in concluding that trial counsel's failure to object to Detective Cayenne's improper and misleading cell phone testimony and failure to present a cell phone expert at trial to rebut

Cayenne's cell phone testimony did not result in ineffective assistance of counsel.

The postconviction court denied King's claim for relief, stating:

> Trial counsel conducted a thorough cross-examination of Detective Cayenne as to Detective Cayenne's qualifications on the subject of cellphone tracking, as well as on the limitations of such tracking. Importantly, counsel was able to elicit a concession from Detective Cayenne that the cell phone pings did not unequivocally place Defendant at the bus station at the time of the call and further that it was possible Defendant was at home, checking his messages at 5:25 a.m., the time of the call. Indeed, the important aspects of Wyman's testimony were elicited at trial through counsel's cross-examination of Cayenne. Moreover, counsel effectively attacked the fashion in which evidence was collected and continued the attack during his closing argument when he referred to Detective Cayenne's concession by saying, "[a]nd he admitted to it. I didn't have to call an expert." Additionally, at trial, counsel presented the testimony of a criminal defense investigator, Daniel Roberts, who testified that the bus station where the State claimed Defendant was located at the time of the phone call has surveillance cameras. Till used that testimony to support his theory of sloppy police work by suggesting the police could have easily verified if Defendant was at the bus station, but chose not to do so.
>
> At the evidentiary hearing, Till explained that it was a strategic decision not to object to Detective Cayenne's testimony. Specifically, Till noted that if he had objected to Cayenne's testimony on the subject, the State would have simply brought in someone who was more qualified. Rather, counsel was able to elicit testimony to discredit Detective Cayenne's testimony on the subject as outlined above.

Order at 37-38 (citations omitted).

In *Gordon v. State*, 863 So. 2d 1215 (Fla. 2003), the record demonstrated that a witness "simply factually explained the contents of phone records that linked Gordon to [the victim's] murder, and [the Detective] factually compared the

locations on the phone records to locations on the cell site maps." *Id.* at 1219.

This Court held that testimony regarding the content of cell phone records and comparing cellular tower site maps to phone records was not expert testimony. *Id.* In addition, as discussed above, this Court has determined that phone company call lists are not hearsay. *Wade*, 156 So. 3d at 1024 (citing *United States v. Lamons*, 532 F.3d 1251 (11th Cir. 2008)).

King argues that *Gordon* is distinguishable because Detective Cayenne testified to information that far exceeded the confines of *Gordon* and specifically discussed evidence that only someone who works for a cell phone company would have known or could have testified to. However, like this case, *Gordon* addressed a detective who testified at trial regarding cell phone records, and even went beyond the records to testify about roaming areas, location of cell sites regarding cellular phones, and the location of individuals placing certain cell phone calls. 863 So. 2d at 1219 n.4. This Court still did not find error in the trial court's decision that the testimony given by the two witnesses did not constitute expert testimony. *Id.* at 1224.

Here, Detective Cayenne testified that the cell phone records showed that King was not at home during the approximate time of the murder, which was contrary to King's statements to police. However, King's trial counsel was also able to elicit important concessions from Detective Cayenne during cross-

examination. For example, Detective Cayenne ultimately agreed that it was possible that King was at home on his front porch when the call was made at 5:24 a.m., ultimately attacking the credibility of Detective Cayenne's prior testimony. Till testified that he did not need a cell phone expert because he was able to sufficiently cross-examine Detective Cayenne.

At the postconviction evidentiary hearing, Robert Wyman provided expert testimony on GPS and cell phone-location data. Wyman concluded that King could have been at home when he placed the 5:24 a.m. phone call the day of the murder, and the tower his phone utilized in making the call was not necessarily the tower closest to King when he placed the call. Wyman explained that only a phone company employee would know the directionality of a cell phone tower; a detective would not be able to determine that from the records he was provided.

King fails to show how a cell phone expert's testimony would have elicited anything different than what Till was able to show through his cross-examination of Detective Cayenne or, more importantly, how King was prejudiced by Till's actions. *See Bryant v. State*, 901 So. 2d 810, 821 (Fla. 2005) (holding that a defendant alleging ineffective assistance of counsel for failure to call specific witnesses is "required to allege what testimony defense counsel could have elicited from witnesses and how defense counsel's failure to call, interview, or present the witnesses who would have testified prejudiced the case" (quoting *Nelson v. State*,

- 36 -

875 So. 2d 579, 583 (Fla. 2004))).  For these reasons, King is unable to prove that trial counsel provided ineffective assistance.

Accordingly, King is not entitled to relief on this claim.

### 9.  Failure to Object to the Leading Questioning of Witness Rashad Montfort

Next, King argues that the postconviction court erred in concluding that trial counsel's failure to object to leading questioning, which resulted in misleading testimony from Montfort, a key witness, did not result in ineffective assistance of counsel for failure to establish either deficiency or prejudice.  The testimony King challenges includes the following excerpt from direct examination of Montfort:

> Q:  Okay.  At this point he's—you tell him, hey, they came to talk to me about the car you let me hold and he doesn't say anything, right?
> A:  Yes, sir.
> Q:  And you're trying to get him to talk about the car and about the murder, right?
> A:  Yes, sir.
> Q:  And he's not talking at all about it?
> A:  No, sir.
> Q:  He's not denying that he loaned you the car, gave you the car?
> A:  No, sir.
> Q:  He doesn't say what are you talking about, I don't know what you're talking about, does he?
> A:  No, sir.
> Q:  He doesn't say what are you talking about, I don't know what you're talking about, does he?
> A:  No, sir.
> Q:  Okay.  And this goes on for several more minutes, right?
> A:  Yes, sir.
> Q:  Doesn't mention it.

The State then asked Montfort, "And at this point he tells you to say you don't know, you don't know, right?" Montfort replied, "Yes, sir." The State continued, "He's telling you in terms of talking to the police, say you don't know, you don't know, right?" "Yes, sir," Montfort responded.

The postconviction court summarily denied King's claim for relief, stating:

> As Defendant admits, counsel objected to the leading questions referred to by Defendant. However, Defendant asserts it was deficient conduct to allow the State to continue their questioning without obtaining a ruling on those objections. The Court finds that even if the trial court had sustained the objections made, the substantive testimony would have still been elicited, the State would have merely had to rephrase the questions. Indeed, counsel never received a ruling on the objection because the State moved on with its questioning. Thus, the Court finds the outcome of the proceeding would not have been different even if counsel had obtained a favorable ruling on his objections.
>
> Defendant next contests the State's structure of its examination of Montfort. Specifically, Defendant argues it was improper for the State to play only portions of the recorded conversations between Defendant and Montfort, starting and stopping those segments to ask Montfort to explain what was occurring in the conversation. Defendant cites to no rule or case law to support his assertion that such testimony would have been objectionable. The Court finds the questioning was permissible. Moreover, as the jury heard each segment the State asked Montfort to interpret, the Court finds the questioning was not misleading and the jury was free to interpret the conversation as they deemed appropriate. Thus, the Court finds counsel was not deficient. *See Hitchcock v. State*, 991 So. 2d 337, 361 (Fla. 2008) ("Counsel cannot be deemed ineffective for failing to make meritless objection.").
>
> Lastly, Defendant specifically contests the State asking Montfort to clarify what Defendant meant by stating "You say you don't know, you don't know" in direct examination and redirect examination. While counsel did not object to the State's questions, during cross-examination and recross-examination, counsel got

> Montfort to say he believed Defendant may have simply been telling Montfort that if he did not know anything, that is all he could say to the police. Further, the Court again notes that the jury heard the portion of the conversation Montfort was asked to clarify and was able to interpret the statement as they felt appropriate. Thus, the Court does not find the questioning misleading.

Order at 47-48 (citations omitted).

King argues that trial counsel should have objected to the State's improper leading questions, which led the jury to believe that Montfort asked King about the vehicle and that King did not deny having loaned the car to Montfort. However, as noted by the postconviction court and in King's Initial Brief to this Court, King's counsel did object to the leading questions. *Id.*; Initial Br., at 61. Despite the objection, the State continued with its questioning before the trial court ruled on the objections. King claims this constitutes ineffective assistance of counsel.

We conclude that, even assuming King's counsel was deficient for failing to object to the questions as leading, King cannot prove that he was prejudiced. The State's "yes" or "no" questions to Montfort were unquestionably leading questions. If this Court were to consider counsel's failure to obtain a ruling on the objections akin to not objecting at all, failing to object to questions that call for a "yes" or "no" answer does not necessarily establish ineffective assistance of counsel. *Happ*, 922 So. 2d at 192 ("In respect to those questions which are leading in the context of . . . direct examination, it was not demonstrated that counsel was ineffective so as to breach the *Strickland* standard or that there was *Strickland* prejudice.").

Moreover, even if King's counsel would have objected to the questions, the State could have elicited the same information from Montfort simply by rephrasing the objected-to questions.

Finally, trial counsel was able to get Montfort to clarify some of his answers. Therefore, as the postconviction court explained, the jury could make its own factual conclusions based on Montfort's clarifications, especially after Montfort recounted King's offer for him to take the car out and "use it and bring it back." Order at 48. Thus, confidence in the outcome of the trial was not undermined.

Accordingly, King is not entitled to relief on this claim.

### 10. Failure to Object to Leading Questioning of Witness Detective Cayenne

Next, King argues that the postconviction court erred in concluding that trial counsel's failure to object to Detective Cayenne's misleading testimony at trial did not result in ineffective assistance of counsel for failure to establish either deficiency or prejudice. King takes issue with Till's failure to object to the following portion of the State's redirect examination of Detective Cayenne:

> STATE: Counsel asked you about whether or not you were successful with the controlled wires with Mr. Montfort and [Defendant]. But you said that meaning he wasn't successful meaning he didn't outright admit that I killed [the victim], is that correct?
> CAYENNE: That's correct.
> STATE: Did he have any response to when Mr. Montfort says, hey, you know that vehicle you let me hold?
> CAYENNE: Right. He didn't give any response at all. He didn't say a word.

The postconviction court denied the claim for relief, concluding:

> Through questioning of Montfort, the State explained that while the wire recorded everything, including Montfort walking to Defendant's, urinating, and playing with Defendant's dog, the State would only be playing clips of the conversation. However, the jury heard the relevant portions of the conversation between Montfort and Defendant. The Court does not find that the very limited questioning of Detective Cayenne contested in this claim misled the jury. Montfort testified that Defendant loaned him the victim's car to use for an afternoon. Montfort further stated he wore a wire while talking to Defendant for the purpose of getting Defendant to talk about the car, but that Defendant never admitted to loaning Montfort the car.
>
> Moreover, while the State tried to insinuate Defendant's lack of denial was incriminating, counsel argued Montfort was trying to set Defendant up to protect himself, Defendant said "nothing that's incriminating in any way, shape or form," and Defendant was just "suspicious" and "leery that Montfort may be involved in the killing of [the victim]." Even assuming counsel was ineffective for failing to object to these two questions and failing to cross-examine, there is no reasonable probability the result of the proceeding would have been different in light of the jury's ability to hear portions of the conversations, counsel's arguments using the exchange to his advantage, and the evidence presented against Defendant at trial.

Order at 49-50 (citations omitted).

King claims that one brief exchange during the State's redirect of Detective Cayenne was misleading and prejudicial. However, Till noted that King never said anything incriminating on the audio recording that was played for the jury. In addition, the postconviction court concluded that Montfort testified to loaning King the vehicle and wore a wire to record King talking about the car. *Id.*

The State's argument was based on evidence that was presented to the jury. Even if the State's questioning was improper, the exchange that King challenges

- 41 -

was very brief and likely would have had no impact on the outcome of the trial. This is similar to *Brown*, where this Court decided that many of the prosecution's leading questions related to minor issues, and defense counsel's decision to not object was strategic. 846 So. 2d at 1122. Following *Brown*, even if this Court concluded King's counsel should have objected to this brief line of questioning, King cannot prove that such a brief interaction served to undermine confidence in the outcome of the trial. *Id.*

Accordingly, King is not entitled to relief on this claim.

**11. Failure to Object to Various Comments in State's Closing Argument**

Next, King argues that the postconviction court erred in concluding that trial counsel's failure to object to comments during the State's closing argument and to make specific counterarguments in his own closing argument did not result in ineffective assistance of counsel for failure to establish either deficiency or prejudice. Specifically, King argues that the following comments should have been objected to because the jury was led to believe that the following events occurred: (1) King told Montfort to tell the police that "he doesn't know," (2) Montfort told King that he was going to lie to the police to protect King and not to implicate King; and (3) Montfort asked King about lending him the vehicle within a conversation that occurred on the wire tapes, and King did not give any response to Montfort.

The postconviction court denied King's claim for relief, explaining:

>    Here, the State was properly advancing a legitimate argument based on the facts in evidence and a fair inference from those facts. Trial counsel then advanced a different argument based on a fair inference of those facts. The Court, therefore, finds counsel cannot be deemed ineffective for failing to object to proper argument.
>    As stated in the previous two grounds, the jury had the ability to listen to portions of the conversations between Montfort and Defendant. Counsel then cross-examined Montfort about the conversations, eliciting an interpretation from Montfort that Defendant was only telling him that if he truly did not know anything, he would not have anything to tell the police and a confirmation that Defendant never admitted to loaning the car to Montfort. Counsel further argued for his own interpretation of the conversations to aid the defense.
>    Additionally, the jury instructions advised the jury that the "case must only be decided upon the evidence that you have heard from the testimony of witnesses and have seen in the form of exhibits in evidence and these instructions." Right before closing arguments began, the trial judge informed the jury to "[p]lease remember that what the attorneys say is not evidence."

Order at 50-51 (citations omitted).

King argues that Montfort's taped conversation with King was used to mislead the jury into thinking King admitted guilt by loaning a vehicle to Montfort. However, it is clear that, even if Montfort did not admit on tape that he told King that he was not going to implicate him, the State's redirect examination elicited an affirmation from Montfort of what King meant by saying, "You say you don't know, you don't know." The State used its closing argument to explain inferences that were reasonably drawn from the evidence. The State did not solely rely on the audio recording that was played for the jury between Montfort and King, but also

- 43 -

based its argument on Montfort's testimony under oath. *See Merck v. State*, 975 So. 2d 1054, 1061 (Fla. 2007). Trial counsel cannot be deemed ineffective for failing to object to arguments that are proper, and, in this case, the State's closing argument is based on legitimate testimony from Montfort. *See Rogers v. State*, 957 So. 2d 538, 549 (Fla. 2007).

Furthermore, trial counsel was able to cross-examine Montfort about his conversations with King and effectively argued a different interpretation of the facts to the jury in his own closing argument. Because trial counsel was not deficient and King cannot establish prejudice, King is unable to establish ineffective assistance of counsel.

Accordingly, King is not entitled to relief on this claim.

### 12.  Cumulative Error

Finally, King alleges that he did not receive a fundamentally fair trial due to the numerous errors in his case. Because this Court has not found any of King's individual claims of ineffective assistance of counsel to have merit, there is no basis for this Court to grant relief on King's claim of cumulative error. *See Hall*, 212 So. 3d at 1031.

Accordingly, King is not entitled to relief on this claim.

### CONCLUSION

For the foregoing reasons, the postconviction court's order is affirmed.

It is so ordered.

CANADY, C.J., and PARIENTE, LEWIS, QUINCE, LABARGA, and LAWSON, JJ., concur.
POLSTON, J., concurs in result.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED ON OR BEFORE DECEMBER 27, 2018.  A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED ON OR BEFORE JANUARY 2, 2019.  NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
    Mallory D. Cooper, Senior Judge - Case No. 162010CF001450AXXXMA

Gonzalo Andux, Jacksonville, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Jennifer L. Keegan, Assistant Attorney General, Tallahassee, Florida,

    for Appellee